C. D. SPANGLER AND VEVA C. SPANGLER, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 52776.    Filed June 30, 1959.

*John J. Geraghty*, Esq., and *Elton B. Taylor*, Esq., for the petitioners.

*Richard C. Forman*, Esq., for the respondent.

ATKINS, *Judge:* The respondent determined a deficiency in income tax for the year 1950 in the amount of $94,832.44. The issue is whether the gain derived by the petitioners upon the redemption of class B stock of Double Oaks Apartments, Inc., and Newland Road Apartments, Inc., in the year 1950 is long-term capital gain as reported by the petitioners or whether it is taxable under section 117 (m) of the Internal Revenue Code of 1939 as gain from the sale or exchange of property which is not a capital asset, as contended by the respondent. A question is also raised as to the basis of the stock.

FINDINGS OF FACT.

Most of the facts are stipulated and the stipulations are incorporated herein by this reference.

² In the petition the amount was stated to be $4,330.61; but we have found as a fact that the correct amount was as shown above.

The petitioners are husband and wife, residing at Charlotte, North Carolina. For the taxable year ended December 31, 1950, the petitioners' joint income tax return was filed with the collector of internal revenue for the district of North Carolina. C. D. Spangler will be sometimes referred to as the petitioner.

C. D. Spangler Construction Company (hereinafter referred to as Construction Company) is a North Carolina corporation engaged in the general contracting business. From 1949 until the present time all of its outstanding capital stock has been owned and held 51 per cent by the petitioner and 49 per cent by members of his immediate family.

### Facts as to Double Oaks Project.

On February 28, 1949, the Federal Housing Commissioner entered into a commitment for mortgage insurance, pursuant to section 608 of the National Housing Act, in the amount of $2,233,700, repayable over a period of about 33 years, for a rental-housing project to be built in Charlotte, North Carolina. A mortgagee bank was named therein, the petitioner was designated as the sponsor, and the mortgagor was Double Oaks Apartments, Inc. (hereinafter called Double Oaks), a proposed or prospective corporation. The amount of the commitment was computed by the FHA by deducting from $2,483,762 (being 90 per cent of the stated total replacement cost of the property) an amount of $250,000, the stated fair market price of the land.

In the commitment it was required as a condition to insuring the loan that at time of closing, the mortgagee bank furnish evidence of the collection by it of certain specified sums, including an escrow deposit to cover so-called off-site utilities and streets in the amount of $210,108. Under the FHA requirements, off-site improvements must be financed independently of the insured loan. It was provided in the commitment that a contract between the sponsor of the project and a contractor acceptable to the Commissioner might be presented in lieu of the escrow agreement and cash escrow deposit. The so-called off-site improvements consisted principally of curbs, gutters, and pavements on the project and adjacent streets, a sanitary sewer system on all streets within the project boundary, a water system on all streets within the project boundary and connecting with the city waterline, and a storm sewer system.

On June 15, 1949, the petitioner, as sponsor, entered into a contract with Construction Company, whereby he agreed to pay Construction Company $210,108 upon final completion of the off-site improvements. Construction Company furnished a bond for faithful performance, and the improvements were completed. Upon this contract the petitioner, at an undisclosed time, paid Construction Company an amount slightly in excess of $49,000. The books of Double Oaks show that the corporation paid no amount on account of or for these improvements.

Double Oaks was organized under the laws of the State of North Carolina on May 10, 1949. The incorporators were the petitioners and Lee Wallace. Its charter stated that the object for which it was formed was to provide housing for rent or sale, to improve and operate, and to sell, convey, assign, mortgage, or lease any real estate and any personal property. The charter provided that so long as any property of the corporation was encumbered by a mortgage or deed of trust insured by the Federal Housing Commissioner it should not engage in any business other than the construction and operation of a rental-housing project or projects.

The authorized capital stock consisted of 100,000 shares of class A common stock having a par value of $1 per share, 3,999 shares of class B common stock having a par value of $100 per share, and 100 shares of preferred stock having a par value of $1 per share. The preferred stock carried the right to noncumulative dividends at 5 cents per share before any dividend or distribution upon the common stock, the class B stock was entitled to noncumulative dividends of 6 per cent out of current net earnings before payment of any dividends on the class A stock and had priority upon dissolution over the class A stock. The class B common stock could be retired at $100 per share after the payment of all interest and principal due and after making provision for payment of operating expenses, etc., and after the establishment of a reserve fund for replacements. The charter provided that no such stock could be retired until after the completion of the improvements on the property, or before the final endorsement for mortgage insurance by the Federal Housing Commissioner. The class A common stock had the exclusive voting privilege, except in the case of specified defaults, in which case the preferred stock had the right to elect directors. Upon liquidation the class A common stock was entitled to the entire assets after the payment of the preferred stock and the class B common stock.

The certificate of incorporation also provided that the preferred stock might be retired and should be retired upon, but in no event before, the termination of any contract of mortgage insurance covering any indebtedness to which the FHA was a party. It was also provided that the corporation should not, without approval of the holders of the majority of the shares of the preferred stock, assign, transfer, dispose of, or encumber any real or personal property, including rents, except as permitted by the terms of the mortgage, and should not consolidate or merge with any other corporation, go into voluntary liquidation, effect any plan of reorganization, redeem or cancel any of its shares of preferred stock, or amend the certificate of incorporation.

On June 10, 1949, Double Oaks issued stock for cash at par as follows:

| Type of stock | Number of shares | Name in which issued |
|---|---|---|
| 5 per cent preferred | 100 | Federal Housing Administration |
| A common | 300 | C. D. Spangler Construction Company |
| A common | 100 | Fred L. Taylor |
| B common | 2,194.01 | William G. Lyles, Bissett, Carlisle and Wolf (architects) |
| B common | 136.4 | C. D. Spangler Construction Company |
| B common | 750 | Fred L. Taylor |

Fred L. Taylor is an individual who resides at Pinehurst, North Carolina. He is not related by either blood or marriage to the petitioner and in 1949 and theretofore was not an employee of either the petitioner or Construction Company. On or about January 26, 1950, the 750 shares of class B common stock originally issued to Fred L. Taylor were acquired by Construction Company for $75,000. On May 24, 1950, Construction Company surrendered this stock to Double Oaks for redemption and received therefor $75,000 in cash. On or about November 2, 1950, the 100 shares of class A common stock originally issued to Fred L. Taylor were redeemed for $100.

William G. Lyles, Bissett, Carlisle and Wolf was an architectural firm which maintained its principal office at Columbia, South Carolina. The FHA project analysis and commitment for Double Oaks contemplated that architect fees in the amount of $112,376 and builders' fees in the amount of $107,025, or a total of $219,401, would be paid in stock. The 2,194.01 shares of Double Oaks class B common stock representing the aggregate architect and builders' fees were originally issued to the architects. On August 8, 1949, such 2,194.01 shares were sold to the petitioner for the amount of $16,570. Thereafter and until December 20, 1950, the petitioner owned more than 10 per cent in value of the outstanding stock of Double Oaks.

On June 10, 1949, Double Oaks acquired from the petitioner a ground lease for a term of 99 years on a tract of land containing approximately 69.14 acres located in Mecklenburg County, North Carolina, upon which land the rental units were to be built. The tenant agreed to pay a basic annual rental of $10,000 after the date of completion of the improvements and also agreed to pay all real estate taxes, water charges, sewer rents, and other assessments on the lessor's interest in the leased premises. It was recited in the lease that the tenant contemplated the construction on the premises of a low-cost rental-housing project consisting of buildings and other incidental facilities with all appurtenances thereto. It was provided that the tenant should not demolish any improvements, except for repairs or replacements. The lessor agreed to join with the lessee in any grants for easements for electric, telephone, gas, water, sewer, and other public utilities or facilities as might be necessary in the operation of the demised premises or the

improvements thereon. It was contemplated in the lease that the lessee would mortgage its leasehold interest. It was agreed that if no default existed the lessor would not accept a cancellation of the lease prior to termination without the consent of the mortgagee and, if the mortgage should be insured by the FHA, without the consent of the Federal Housing Commissioner. In the event of default by the lessee, the mortgagee and the FHA would be given notice and had the right to succeed to the rights of the lessee, or obtain a new lease. It was specifically provided that if the mortgagee or the Federal Housing Commissioner should acquire title to the leasehold interest they should have the option to purchase the fee title to the land for $250,000. This option to purchase did not extend to Double Oaks, the mortgagor.

On June 10, 1949, Double Oaks obtained a loan from a bank in the amount of $2,233,700, which was evidenced by a promissory note. To secure the loan of the bank, Double Oaks gave a deed of trust to the bank covering all the property, including the leasehold estate. The note provided that the first monthly payment on principal should be made on December 1, 1950. Advances were made by the bank on the loan as follows:

| Date of advance | Amount | Date of advance | Amount |
|---|---|---|---|
| June 23, 1949 | $22,408.50 | Nov. 3, 1949 | $391,286.42 |
| July 16, 1949 | 132,711.30 | Dec. 3, 1949 | 157,111.84 |
| Aug. 2, 1949 | 315,567.63 | Dec. 30, 1949 | 51,674.66 |
| Sept. 2, 1949 | 454,405.55 | Jan. 18, 1950 | 284,847.80 |
| Oct. 4, 1949 | 423,686.30 | | |

In the FHA commitment, Double Oaks agreed to make certain additional mortgage escrow deposits with the bank as a replacement fund. Deposits of $5,359.60 and $23,879.90 were made on May 31, 1950, and May 31, 1951, respectively.

The note of Double Oaks evidencing the loan of $2,233,700 was finally endorsed for mortgage insurance by the Federal Housing Commissioner on January 23, 1950.

Construction of the housing project began on or about June 10, 1949. On that date Double Oaks entered into a contract with Construction Company under which the latter agreed to build the project for a lump sum of $2,140,493. The contract provided that the petitioner should give an indemnity agreement in the amount of $223,370 to assure completion of the project. Such total amount was paid in several payments by Double Oaks over the period from June 1949 to January 1950. After all the payments were made, Construction Company paid Double Oaks on May 24, 1950, an amount of $171,239.44 as a refund on the construction contract. This amount had been set up on Double Oaks' books on February 28, 1950, as a

refund due from Construction Company and the check by which payment was made also noted that it constituted payment of a note in full for refund on a construction contract. The books of Double Oaks show a journal entry of February 28, 1950, to record this amount as a refund due from Construction Company.

Some of the units were ready for occupancy in November 1949. Double Oaks collected, during the fiscal years ended May 31, 1950, and May 31, 1951, rents in the respective amounts of $115,308.99 and $230,012.77.

Double Oaks made the first payment of principal on its $2,233,700 loan on or about December 1, 1950. During the fiscal years ended May 31, 1950, and May 31, 1951, it paid interest on such loan in the respective amounts of $62,766.45 and $81,771.44.

On May 24, 1950, the petitioner surrendered 1,844.01 shares of class B common stock of Double Oaks to that corporation for redemption and received in exchange therefor the amount of $184,401 in cash. On December 20, 1950, he surrendered an additional 350 shares of class B common stock for redemption and received in exchange therefor the amount of $35,000 in cash. The total of 2,194.01 shares so surrendered and redeemed were the same 2,194.01 shares that petitioner had purchased from William G. Lyles, Bissett, Carlisle and Wolf on August 8, 1949, at a cost of $16,570.

At June 30, 1950, and June 30, 1951, Double Oaks had no accumulated earnings and profits. Its tax returns were filed on an accrual basis. For the fiscal years ended May 31, 1950 and 1951, the returns showed net operating losses of $19,980.36 and $65,354.44, respectively. Its returns for subsequent years through June 30, 1957, also showed net losses except for a small profit in one short period.

The actual cash received by Double Oaks during its fiscal year ended May 31, 1950, amounted to $2,614,976.43, consisting of the following:

| | | |
|---|---|---|
| F. L. Taylor purchase of 750 shares class B stock | | $75,000.00 |
| C. D. Spangler Construction Co. purchase of 136.4 shares class B stock | | 13,640.00 |
| U.S. Treasury—FHA purchase of 100 shares preferred stock | | 100.00 |
| F. L. Taylor—payment of subscription for 100 shares class A stock | | 100.00 |
| C. D. Spangler Construction Co.—payment of subscription for 300 shares class A stock | | 300.00 |
| C. D. Spangler Construction Co.—refund | | 171,239.44 |
| FHA-insured loan (Wachovia Bank & Trust Company) proceeds | | 2,233,700.00 |
| Receipts other than rent and deposits | | 2,494,079.44 |
| Rents collected | $115,330.99 | |
| Tenants' security deposits | 5,566.00 | 120,896.99 |
| Total receipts | | 2,614,976.43 |

The actual cash disbursements of Double Oaks during its fiscal year ended May 31, 1950, amounted to $2,603,808.47, consisting of the following:

| | |
|---|---:|
| Amount originally paid to Construction Co | $2,140,493.00 |
| Expenses capitalized | 107,227.55 |
| Equipment purchased | 2,694.93 |
| Operating expenses | 74,815.30 |
| Mortgage escrow deposits | 5,359.60 |
| Prepaid hazard insurance | 1,467.09 |
| Prepaid mortgage insurance | 12,350.00 |
| Capital stock redeemed | 259,401.00 |
| | 2,603,808.47 |

In 1956, as a result of a requirement of the FHA in connection with the so-called windfall profit, Construction Company purchased at par 496.78 shares of the class B common stock of Double Oaks from that corporation for $49,678. In accordance with an agreement between the FHA and Double Oaks, $10,022.39 of this amount was to be paid on the mortgage indebtedness of Double Oaks and the balance of $39,655.61 was to be retained in the corporation treasury, its disposition to be later determined by conference with the FHA or by lawsuit.

### *Facts as to Newland Road Project.*

Sometime prior to February 28, 1950, the petitioner sponsored a second housing project at Charlotte, North Carolina. Newland Road Apartments, Inc., hereinafter referred to as Newland Road, was organized under the laws of the State of North Carolina on March 15, 1950, for the purpose of carrying out this second project. The incorporators of Newland Road were the petitioner, John D. Shaw, and James M. Poyner. The corporate charter was issued on March 21, 1950, and the pertinent provisions of such charter are identical with the provisions of the charter of Double Oaks.

The authorized capital of Newland Road was $300,000 divided into 100,000 shares of class A common stock with a par value of $1 per share, 1,999 shares of class B common stock with a par value of $100 per share, and 100 shares of 5 per cent noncumulative preferred stock with a par value of $1 per share.

On April 1, 1950, Newland Road issued stock for cash as follows:

| Type of stock | Number of shares | Name in which issued |
|---|---|---|
| Preferred | 100 | Federal Housing Administration |
| A common | 300 | C. D. Spangler Construction Co. |
| B common | 148.03 | William G. Lyles, Bissett, Carlisle and Wolf (architects) |

As in the case of Double Oaks, the petitioner was the sponsor of the Newland Road project, and the FHA committed itself to loan $824,000.

The FHA project analysis and commitment for Newland Road contemplated that architects' fees in the amount of $44,803 and builders' fees in the amount of $42,670, or a total of $87,473, would be paid. As indicated above, 148.03 shares of Newland Road class B common stock were originally issued to the architects. On May 26, 1950, Newland Road paid the architects $3,220 in cash; and on May 29, 1950, the petitioner purchased the 148.03 shares for $1,000. Thereafter, and until December 20, 1950, the petitioner individually owned more than 10 per cent in value of the outstanding stock of Newland Road.

As in the case of the Double Oaks project, the commitment was conditioned upon the completion of certain off-site improvements. On or about April 1, 1950, the petitioner and Construction Company entered into an agreement for the installation of such improvements by Construction Company for $12,945. Newland Road paid no amount on account of or for such off-site improvements.

In the FHA commitment it was required that at the time of closing, the mortgagee bank furnish evidence of the collection of certain specified sums, including an escrow deposit to cover the so-called off-site improvements in the amount of $12,945.

On April 1, 1950, Newland Road acquired from the petitioner a ground lease, similar to that acquired by Double Oaks, at a basic annual rental of $1,760, for a term of 99 years on a tract of land containing approximately 17.75 acres located in Mecklenburg County, North Carolina, upon which land the rental units were to be built. As in the case of Double Oaks, the ground lease granted an option to purchase to the mortgagee or the Federal Housing Commissioner.

On the same date, Newland Road obtained a loan from a bank in Charlotte, North Carolina, in the amount of $824,000 which was evidence by a promissory note. Such note provided that the first monthly payment on principal should be made on April 1, 1951. Advances were made by the bank on the loan as follows:

| Date of advance | Amount |
| --- | --- |
| Apr. 8, 1950 | $36,807.00 |
| May 3, 1950 | 198,984.64 |
| May 24, 1950 | 207,064.06 |
| June 16, 1950 | 207,008.21 |
| Sept. 23, 1950 | 174,136.09 |
| | 824,000.00 |

To secure the loan Newland Road executed a deed of trust in favor of the bank. As in the case of the Double Oaks property, the deed of trust given by Newland Road to the bank covered all of the Newland Road property, including the leasehold estate.

The note of Newland Road evidencing the loan of $824,000 made by the bank to Newland Road was endorsed (final endorsement) for mortgage insurance by the Federal Housing Commissioner on October 16, 1950.

Newland Road made the first payment of principal on its $824,000 loan on or about April 1, 1951. Prior to December 31, 1950, Newland Road had paid a total of $13,916.41 as interest on such loan.

On or about April 1, 1950, Newland Road began construction of the rental-housing project. On that date Construction Company entered into a contract to construct the buildings for a lump sum of $758,413, or cost plus $15,000, whichever was lower, and in addition 726.70 shares of the class B common stock of the corporation. The contract provided that the petitioner should give an indemnity agreement in the amount of $82,400 to assure completion of the project.

Newland Road made payments to Construction Company for "construction fee" as follows:

| | |
|---|---|
| Apr. 1950 | $12,000 |
| May 1950 | 297,000 |
| June 1950 | 204,000 |
| July 1950 | 100,000 |
| Sept. 1950 | 145,413 |
| | 758,413 |

Some units in the project were ready for occupancy in July 1950, and from the date of first occupancy to December 1950, the rents collected by Newland Road amounted to $35,258.45.

On December 20, 1950, Spangler surrendered 148.03 shares of class B common stock of Newland Road to that corporation for redemption and received in exchange therefor the amount of $14,803 in cash. The shares so surrendered and redeemed were the same shares that Spangler had purchased from William G. Lyles, Bissett, Carlisle and Wolf on May 29, 1950, at a cost of $1,000.

At December 31, 1950, Newland Road had no accumulated earnings and profits. Its tax returns were filed on an accrual basis. For the fiscal year ended December 31, 1950, the return showed net operating losses of $3,579.55. Its returns for subsequent years through June 30, 1957, also showed net losses.

The actual cash received by Newland Road during its fiscal year ended December 31, 1950, amounted to $860,914.45, consisting of the following:

C. D. Spangler Construction Co.—payment for subscription to
   capital stock_____ $300.00
U.S. Treasury preferred stock_____ 100.00
FHA mortgage receipts_____ 824,000.00
                                                                                  ————————
   Total receipts other than rent or other business operations_ 824,400.00
Rents collected_____ $34,556.45
Tenants' security deposits_____ 1,958.00   36,514.45
                                                                                    ————————
   Total receipts_____ 860,914.45

The actual cash disbursements of Newland Road during its fiscal year ended December 31, 1950, amounted to $860,017.27, consisting of the following:

Amount paid for depreciable assets_____ $787,139.70
Operating expenses_____ 19,243.98
Mortgage escrow deposits_____ 23,918.00
Prepaid items_____ 1,912.59
Net loan to Construction Co_____ 13,000.00
Redemption of stock_____ 14,803.00
                                                               ————————
   Total_____ 860,017.27

In their joint income tax return for the year ended December 31, 1950, the petitioners reported long-term capital gain of $202,831 from the redemption of the class B common stock of Double Oaks and $13,803 from the redemption of the class B common stock of Newland Road.

In the notice of deficiency for the year 1950, the respondent stated:

It has been determined that Mr. Spangler realized during the taxable year ordinary income in the amount of $216,634.00 of which $202,831.00 was received with respect to 2,109.01 shares of Double Oaks Apartments, Inc., stock and $13,803.00 with respect to $148.03 [*sic*] shares of Newland Road Apartments stock.

It is held that this amount is taxable under the provisions of Section 22(a) of the Internal Revenue Code. Since you reported in your return for this year $108,317.00 (50% of $216,634.00) in respect to these transactions your net income has been increased by the amount of $108,317.00.

By amended answer filed November 13, 1957, the respondent alleged as follows:

In the statutory notice of deficiency, dated February 16, 1954, it was determined that the petitioners realized ordinary income within the provisions of section 22(a) of the Internal Revenue Code of 1939 in the amount of $216,634.00 in 1950, of which $202,831.00 was realized with respect to 2,194.01 shares of Double Oaks Apartments, Inc. stock and $13,803.00 with respect to 148.03 shares of Newland Road Apartments, Inc. stock. As an additional reason in support of the deficiency determined in the statutory notice of deficiency dated February 16, 1954, respondent asserts that ordinary income was realized by the petitioners with respect to the Double Oaks Apartments, Inc. transactions within the provisions of section 117(m) of the Internal Revenue Code of 1939 since both of

said corporations are collapsible corporations within the provisions of that Code section.

Double Oaks and Newland Road were formed or availed of principally for the construction of properties with a view to the realization by the petitioner as a shareholder of gain attributable to the properties through distributions to him as a shareholder or exchange of stock by him as a shareholder before the realization by the corporations of substantial parts of the net income to be derived from the properties.

## OPINION.

The petitioners reported the gain upon the redemption of the class B stock of Double Oaks and Newland Road as long-term capital gain, including in taxable income only one-half thereof. They contend that this is the proper treatment to be given to such gain. They point out that neither corporation had earnings and profits available for the payment of dividends and that hence the amounts distributed may not be taxed as dividends. They also contend that the distributions are governed by section 115 (d) and that any gain is taxable at capital gains rates. But the real issue here is whether the gains realized are to be taxed, pursuant to section 117 (m) of the Internal Revenue Code of 1939,[1] as gains from the sale or exchange of assets which are not capital assets.

---

[1] Section 117 (m), as applicable to the year 1950 provides in part as follows:

(m) Collapsible Corporations.—

(1) Treatment of gain to shareholders.—Gain from the sale or exchange (whether in liquidation or otherwise) of stock of a collapsible corporation, to the extent that it would be considered (but for the provisions of this subsection) as gain from the sale or exchange of a capital asset held for more than 6 months, shall, except as provided in paragraph (3), be considered as gain from the sale or exchange of property which is not a capital asset.

(2) Definitions.—

(A) For the purposes of this subsection, the term "collapsible corporation" means a corporation formed or availed of principally for the manufacture, construction, or production of property, or for the holding of stock in a corporation so formed or availed of, with a view to—

(i) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, prior to the realization by the corporation manufacturing, constructing, or producing the property of a substantial part of the net income to be derived from such property, and

(ii) the realization by such shareholders of gain attributable to such property.

*     *     *     *     *     *     *

(3) Limitations on application of subsection.—In the case of gain realized by a shareholder upon his stock in a collapsible corporation—

(A) this subsection shall not apply unless, at any time after the commencement of the manufacture, construction, or production of the property, such shareholder (i) owned (or was considered as owning) more than 10 per centum in value of the outstanding stock of the corporation, or (ii) owned stock which was considered as owned at such time by another shareholder who then owned (or was considered as owning) more than 10 per centum in value of the outstanding stock of the corporation;

(B) this subsection shall not apply to the gain recognized during a taxable year unless more than 70 per centum of such gain is attributable to the property so manufactured, constructed, or produced; and

(C) this subsection shall not apply to gain realized after the expiration of three years following the completion of such manufacture, construction, or production.

Upon this issue the petitioners contend that the burden of proof is upon the respondent to show that all the prerequisites of section 117(m) are present, and their arguments on briefs are based largely upon alleged failures of the respondent to show necessary factual matters. The petitioners are in error in their contention that the respondent has the burden of proof. In the notice of deficiency the respondent held that the gain upon the redemptions, and not the full amounts received in distribution, was taxable under the provisions of section 22(a) of the Internal Revenue Code of 1939. In such notice he referred to the income as "ordinary income" but we attach no particular significance to this since, if the transaction did fall within section 117(m), such gain would be taxed as ordinary income as distinguished from capital gain. The respondent did not, in the notice of deficiency, state any particular reason for including this gain in income but relied generally upon section 22(a) which embraces "gains or profits and income derived from any source whatever." Under such a broad determination in the deficiency notice, he was free to advance section 117(m) in support of his determination without assuming the burden of proof. The fact that he amended his answer about 2 months prior to the hearing to rely specifically upon section 117(m) does not bring him within our Rule 32 relating to the pleading of new matter as to which the burden of proof is upon him. See *Leland D. Payne*, 30 T.C. 1044, on appeal (C.A. 5), and *Arthur Sorin*, 29 T.C. 959, on appeal (C.A. 2), and cases cited therein.

The case of *W. H. Weaver*, 25 T.C. 1067, cited by the petitioners, is not in point. There the respondent, in the notice of deficiency, held that the value of stock received by the taxpayer constituted compensation for services taxable under section 22(a). Later, by amended answer he raised an entirely new issue, resulting in application for increased deficiencies, based upon the assertion that the taxpayer was in receipt of income upon the redemption of stock, taxable under section 117(m).

The petitioners have also cited *Thomas Wilson*, 25 T.C. 1058, appeal dismissed (C.A. 4). There the taxpayers had sold some stock to third parties and had caused some of their stock to be redeemed by the corporations. The taxpayers in their returns treated the gain, and in some instances, where the basis was negligible, the entire amounts received, as long-term capital gain. In the notices of deficiency for the year 1950, the respondent stated that the petitioners "realized during the taxable year ordinary income" in the amount received and stated that "[i]t is held that this amount is taxable under the provisions of section 22(a) of the Internal Revenue Code." Therein the respondent did not refer to section 117(m) or any other section, except section 22(a). Thus, as is true in the instant case, he did not state

any particular reason for his determination. Accordingly, no language employed in the deficiency notices directly or by necessary inferences excluded a reliance by the respondent upon section 117(m). In that case, it is true, the respondent in his notices of deficiency held that the full amounts received upon the dispositions of the stock were taxable as ordinary income, and did not allow any basis for the stock in his calculations. However, as we stated in *Arthur Sorin, supra,* section 117(m) would require taxation of the entire receipt if the basis of the stock was zero, and there is nothing in that section or elsewhere which relieves a taxpayer of the obligation of proving his basis or which prevents the respondent from assuming that the basis is zero in the absence of a contrary showing. Upon a careful reexamination of the *Wilson* case, we are of the opinion that our holding that the burden of proof was upon the respondent with respect to the section 117(m) issue was erroneous, and it will not be followed in the future.

The burden of proof is upon the petitioners, and they have not shown that the corporations were not collapsible corporations within the definition of section 117(m). Rather, we think the record establishes that they were. The pattern is similar to that which we considered in *Raymond G. Burge,* 28 T.C. 246, affd. (C.A. 4) 253 F. 2d 765, *R. A. Bryan,* 32 T.C. 104, and *W. H. Weaver,* 32 T.C. 411. Here the corporations were set up with two classes of common stock. Although the petitioner was not the record owner of any of such stock at the beginning he later acquired stock while the construction of the properties was in progress. Class B common stock had been issued ostensibly as fees to the architects, but this was purchased by the petitioner at a small fraction of the par value thereof. In this connection we note that although the FHA commitment contemplated that a large amount of class B stock of Double Oaks would be issued to Construction Company as a construction fee, that corporation did not receive such stock. Rather, the architects received such stock, in addition to other stock, and it was the total amount of stock held by the architects which the petitioner later purchased and which was redeemed by the corporations at par.

The first redemption by Double Oaks was in May 1950, which was approximately 4 months after completion of construction. At that time the petitioner relinquished 1,844.01 shares of the class B stock and received $184,401. The second redemption was in December 1950, which was about 11 months after completion of construction. This involved 350 shares of class B stock for which the petitioner received $35,000.

In the case of Newland Road the petitioner transferred to the corporation 148.03 shares of class B common stock and received $14,803. This redemption occurred about 2 months after the completion of

construction. At the time of each redemption the petitioner held all the common stock except that held by his wholly owned corporation, Construction Company, and except for a negligible amount of class A common stock in Double Oaks which was held by Fred L. Taylor at the time of the first distribution.

In the case of each corporation, the amount of the FHA loan exceeded the cost of construction by more than the total distributed upon redemption. In the case of Double Oaks the original amount paid for construction was $2,140,493, but due to the refund by Construction Company on May 24, 1950, of $171,239.44,[2] the actual cost of construction was $1,969,253.56. The FHA-insured loan, which was in the amount of $2,233,700 exceeded the actual construction cost by $264,446.44. The total distributed by the corporation to the petitioner was $219,401. In the case of Newland Road the FHA-insured loan was $824,000, which was $65,587 in excess of the construction cost of $758,413. The amount of the distribution by Newland Road to the petitioner was $14,803.

The net income to be derived from the properties here would consist of rental income over the life of the properties or the lease. It seems clear, therefore, that at the times of redemption the corporations had not realized substantial parts of the net income to be derived from the properties. See *R. A. Bryan, supra.*

All of the foregoing leads us to the conclusion that within the meaning of section 117 (m) (2) the two corporations were formed or availed of principally for the construction of the properties with a view to a sale or exchange of the class B stock by the petitioner as a shareholder, or a distribution to him as a shareholder, prior to the realization by the corporations of substantial parts of the net income to be derived from the properties and also with a view to the realization by the petitioner as a shareholder of gain attributable to the properties.

The petitioners point to section 117 (m) (3), which provides that in the case of gain realized by a shareholder upon his stock in a collapsible corporation, section 117 (m) does not apply to the gain recognized during a taxable year unless more than 70 per centum of such gain is attributable to the property constructed. They argue that the respondent has not shown that at least 70 per centum of the gain is attributable to the property constructed. They contend that more than 30 per centum was attributable to operation of the business, principally from collections of rentals. As pointed out above, the burden of proof is not upon the respondent, and insofar as this record shows the full amount of the distributions may have been actually paid out of, or at least

---

[2] The petitioners on brief contended that this was not a reduction in the contruction price, but was a contribution to capital by Construction Company. But the stipulated facts show that this payment was on account of a note receivable, which note had been entered on the books of Double Oaks on February 28, 1950, as representing a refund due on the total cost of construction.

attributable to, the excess of the loans obtained over the construction costs. In such event the instant case would fall squarely within the holding in *Raymond G. Burge, supra.* See also *R. A. Bryan, supra,* and cases cited therein. But even if more than 30 per centum of the distributions was paid out of rentals received or might be said to be attributable to rentals received, we think the answer is the same. As stated in *R. A. Bryan, supra,* "we consider it immaterial whether the distributions in redemption of the stock were paid out of the mortgage loans or whether they were made out of rentals received by the corporations. In either event the gain derived by the shareholders was attributable entirely to the property constructed."

It should be added that it does not appear that any of the distributions were paid out of paid-in capital. Nor do we see how, as argued by the petitioners, that under the circumstances here presented, any part of the gain on the redemption could be attributable to the off-site improvements for which the corporations did not pay.

In view of the foregoing we hold that, pursuant to section 117(m), the gain derived by the petitioner upon the redemption of his stock of each corporation is to be considered as gain from the sale or exchange of property which is not a capital asset.

There remains for consideration the question whether the basis of the stock of Double Oaks should be increased to $66,248. This amount is $49,678 greater than the actual cost of the stock to the petitioner. This issue was raised by an amendment to the petition filed shortly before the trial. Therein the petitioners gave no reason for such an increased basis, but at the hearing it developed that the petitioner had entered into a contract on June 15, 1949, with Construction Company to make certain so-called off-site improvements for $210,108. W. D. Cornwell, who was vice president of Construction Company and who had been president and vice president of Double Oaks, testified that the petitioner paid Construction Company for its performance under that contract. He stated that the petitioner paid "$49,000 and some few dollars, I don't recall the exact dollars." Upon the basis of his testimony, we have found as a fact that the petitioner did pay an amount slightly in excess of $49,000. Whether the full amount was ever paid and by whom is not shown. Another circumstance which is not explained in the record is that the amount of $49,678, the amount by which the petitioners seek to increase the basis of the stock, is precisely the same amount which 7 years later, in 1956, the FHA, in connection with so-called windfall profit, required Construction Company to pay to Double Oaks for the issuance of 496.78 shares of class B stock.

The circumstances surrounding the contract which petitioner entered into with Construction Company for the so-called off-site improvements were these: In the original commitment the FHA re-

quired as a condition to insuring the construction loan to Double Oaks, that off-site improvements be made and that the mortgagee give assurance that it had either collected a deposit therefor or that a satisfactory contract between the sponsor and a contractor be entered into for such construction. As stated, the petitioner did enter into such a contract with Construction Company. At that time the petitioner was not a record holder of stock of Double Oaks, although he later received the stock which had originally been issued to the architects.

It is the contention of the petitioners that since the off-site improvements were essential to Double Oaks in order to obtain the loan and build the housing project, the payment made by the petitioner was for the purpose of protecting, or enhancing the value of, his stock and that hence it should be considered as in effect a contribution to the capital of Double Oaks, thereby increasing the basis of such stock. This contention might be well taken except for the fact that the petitioner's relation to Double Oaks was not merely that of a stockholder. He chose not to transfer the land to the corporation, but rather entered into a lease with it providing for a basic annual rental of $10,000, plus payment of taxes, etc. The improvements themselves, although called off-site, appear to have been largely upon the site of the project, although to some extent perhaps off the premises. They also appear to have been essentially improvements to the land itself, consisting of pavements, curbs, gutters, a water system, a sanitary sewer system, and a storm sewer system. Even though, as pointed out by the petitioners, the payment might be considered as benefiting the petitioner as a stockholder, it is also obvious that the expenditure was also of benefit to the petitioner as the owner of the land and as lessor, inasmuch as he was certainly interested in seeing that the corporation was in a position to pay the agreed rental.

We are not advised as to how the petitioner treated this expenditure on his own books of account. Neither of the petitioners testified. It does appear, however, that the corporation on its books did not treat this expenditure by the petitioner as a contribution to its capital. Nor did its books reflect the payment as a payment by it or on its behalf.

On the basis of this record, we cannot conclude that the payment here was essentially a payment on behalf of the corporation or that it was intended to be or constituted a contribution to the capital of the corporation. The respondent contends that the payment was basically additional cost of the land itself and on the record we cannot find that this is not so. We have examined all the cases cited by the petitioners, but find that none of them involves facts comparable to those here presented.

The petitioners argue that since the land was under lease for 99 years and that presumably the improvements in question would be

exhausted during that term, any real benefit to the petitioner from the $49,000 payment could come only from his participation as a stockholder and that when the petitioner disposed of his stock by having it redeemed his benefit from the expenditure ceased. This of course, is not correct since he continued to be the owner and lessor. The petitioners also contend that the only way the expenditure could ever be recovered tax free would be to include it in the cost of the stock in computing gain upon the redemption. Obviously, however, it could be recovered tax free upon a disposition of the land, as a part of the basis thereof. No restrictions were imposed upon the petitioner as to disposition of the land, although any sale would be subject to the lease and the option to purchase the land for $250,000 given to the mortgagee and the FHA in the event they found it necessary to take over the mortgaged premises, including the lease.

We hold that the basis of the stock of the petitioner should not be increased by the $49,000 expenditure.

Reviewed by the Court.

*Decision will be entered for the respondent.*