Henry G. Wilton and Ethel S. Wilton v. Commissioner.
Wilton v. Commissioner
Docket No. 94344.
United States Tax Court
T.C. Memo 1965-300; 1965 Tax Ct. Memo LEXIS 31; 24 T.C.M. (CCH) 1656; T.C.M. (RIA) 65300; November 15, 1965
James R. McGowan, for the petitioners. Lawrence A. Wright, for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: The respondent determined deficiencies in income taxes and addition to the tax for the years 1954 and 1955 as follows: Addition to Tax
Sec. 294(d)(2),
Year
Deficiency
1939 Code
1954
$ 833.99
$303.72
1955
6,768.54
0
The issues for decision are (1) whether expenses incurred *32 in the operation and maintenance of the yacht "Bluebill" in the amounts of $1,710.78 and $8,053.36 for the taxable years 1954 and 1955, respectively, are deductible as ordinary and necessary business expenses and (2) whether the petitioners are entitled to a deduction of $34,861.15 in 1955, representing one-half of the loss on the sale of the Bluebill. Findings of Fact Some of the facts are stipulated and are found as stipulated. During 1954 and 1955, Henry G. Wilton and his wife, Ethel S. Wilton, were residents of Arlington, Massachusetts, and filed timely joint Federal income tax returns for 1954 and 1955 which the district director of internal revenue, Boston, Massachusetts. References herein to petitioner will mean Henry G. Wilton. Petitioner was born in 1896 and at the time of his testimony by deposition, taken on November 12, 1963, he was 67 years old and in ill health. He served in the United States Army during World War I and, following such service, became associated with an office dealing generally in insurance and real estate. Beginning in 1926, he was self-employed in his own business, with offices at 673 Massachusetts Avenue, Arlington, Massachusetts. He became *33 engaged in real estate activities for his own account in 1926, and was licensed as an insurance broker in 1932. Petitioner had been interested in boats all of his life and has owned approximately a dozen small boats, including rowboats and canoes. Prior to entering the Navy in 1942, he owned a 34-foot fishing boat. Beginning in June 1941, petitioner joined the Coast Guard Auxiliary; thereafter, until February 1942, his fishing boat was used in Coast Guard patrolling of the Massachusetts coast. In February 1942, two months after the attack on Pearl Harbor, he joined the Navy. About this time, he donated his boat to the Navy. Petitioner's business decreased sharply during his absence in the Navy. During that period, he continued to maintain his customary office at 673 Massachusetts Avenue, Arlington, Massachusetts. Although petitioner performed some piloting and other services, including duty with two Seabee battalions, his principal assignment as a naval officer was with the Marine Corps in Pacific combat areas where he served as a "beachmaster." In the course of this service, he sustained wounds resulting in the loss of the sight of one eye, internal injuries from bomb blast *34 and a leg injury. Prior to the end of the Pacific war, he was flown to the United States for hospitalization and spent until June 1946 in Chelsea Naval Hospital. He was retired from the Navy the same month by reason of his injuries with the rank of Commander. Until 1948 or approximately one and one-half years following his release from the hospital, petitioner was largely unable to get around or to resume his business. In 1948 he began the restoration of his business in conjunction with his son Bob, who formerly had been associated with him. In his income tax returns for the years 1948 through 1955 petitioner stated his "Occupation" as follows: Year
Occupation
1948
Real Estate and Insurance
1949
Real Estate and Insurance
1950
Real Estate and Insurance
1951
Real Estate and Insurance
1952
Insurance
1953
Insurance
1954
Insurance
1955
Insurance
In so far as shown petitioner's real estate activities for the years 1948 through 1952 consisted of the renting of business properties, including a number of gasoline stations, all owned by him personally and beginning in 1950 the sale of these properties. He reported no profits or losses from rental activities *35 for 1953 or either of the taxable years 1954 or 1955. Most, if not all, of the properties were acquired in the 1940s and were disposed of during the period 1950 through 1953, the results of one sale being reported in petitioner's return for 1953. According to ledger sheets from petitioner's books of account, petitioner did receive property management fees of $675.09 in 1954 and $663.54 in 1955 from Touraine Stores, Inc., [1] and may have received similar fees in 1953. In February 1948 petitioner purchased a 60-foot motor-sailing vessel called the Bluebill. The Bluebill was a deep-water vessel almost twice the size of the 34-foot fishing boat owned by him before the war. The yacht was 55 feet on the waterline, 66 feet, 6 inches overall, and could sleep nine people comfortably. The Bluebill had been in naval service during the war and in 1948, at the time of its purchase by petitioner, was in the process of being returned to its owner, a man named Gilbain, in Providence, Rhode Island. *36 At this time the yacht was not in good shape and required substantial expenditures of money for a new diesel engine and for new plumbing and heating equipment. During the years petitioner owned the Bluebill he incurred the following capital expenses in connection with its acquisition and maintenance: Capital
Total
Year
Expenditures
Cost
1948
Purchased
$ 22,500.00
1948
$33,050.93
55,550.93
1949
7,632.55
63,183.48
1950
21,491.96
84,675.44
1951
5,397.12
90,072.56
1952
10,252.49
100,325.05
1953
14,241.55
114,566.60
1954
11,460.93
126,027.53
1955
8,269.99
134,297.52
Petitioner used the Bluebill around Cape Cod in the summertime with an occasional trip to Maine, and in the wintertime operated it out of Fort Lauderdale, Florida, with occasional runs to the Bahamas. From January through April of 1954, the Bluebill was in Florida or the Bahamas. It was then returned to New England where it underwent repairs for a period of approximately one month. From about the middle of June until the middle of November it remained in New England and was used for various cruses along the Massachusetts coast and around Cape Cod. Thereafter it departed *37 for Florida, arriving at Daytona Beach during the first week in December where it remained docked until late January of 1955. The petitioner returned to New England during this period. Upon his return, the yacht continued in Florida waters until early February of 1955, when it went to the Bahamas and remained there until late March when it departed for Massachusetts with stops at Florida ports enroute. Upon arrival in Massachusetts about the middle of April it underwent extensive repairs lasting until the first week in July. The yacht was being put in first class condition with a view to prompt sale. From this time until it was actually sold, the yacht, when used, was devoted primarily to the entertainment of prospective purchasers or brokers. Petitioner had decided sometime in 1953 to sell the Bluebill and so listed it with brokers until its sale early in October of 1955. The sale price was $45,000. While in Florida petitioner entertained guests aboard the Bluebill with some frequency. Most of this entertainment was while the boat was at dock-side or on short cruises of one-half to one day's duration. This was particularly true of purported business guests. For a considerable *38 period of time petitioner's mother was regularly aboard. [2] There was much less entertainment of guests aboard during the periods the Bluebill was in the Bahamas and in so far as shown much, if not most of the time, petitioner was alone. Also on the trips of the Bluebill between New England and Florida it was petitioner's practice to travel alone. Among the guests aboard the Bluebill *39 in 1954 and 1955 were some 20 individuals with whom petitioner did varying amounts of insurance business during those years. The amounts ranged from $10.00 to $5,723.74 for total premium dollar volume [3] of approximately $19,500 in 1954 and $14,000 in 1955. A goodly number of these, at least, were entertained aboard the Bluebill at dockside or short runs while the Bluebill was in Florida. Among the guests of petitioner aboard the Bluebill while it was in New England in 1954 and 1955 were members of his own staff, employees of Harvard Trust Company, Cambridge, Massachusetts, and employees of the town of Arlington, Massachusetts. Various combinations of these guests were entertained at least three times, respectively, in 1954 and 1955. Also entertained aboard the Bluebill while it was in New England in 1954 were Myron Halpern and members of his family. Halpern was president of Touraine Stores, Inc. During the years 1948 through 1955 petitioner's profits and *40 losses from the insurance business, as shown by his returns, were as follows: Gross
Profit
Year
Receipts
Expenses
or (Loss)
1948
$39,475.49
$27,934.07
$11,541.42
1949
36,116.46
31,638.07
4,478.39
1950
24,463.82
29,965.74
(5,501.92)
1951
33,683.88
32,566.37
1,117.51
1952
33,847.09
34,679.69
(832.60)
1953
34,142.40
33,143.90
998,50 [1]
1954 [2]
38,701.11
38,257.27
443.84
1955 [3]
49,546.92
84,549.08
(35,002.16)
According to petitioner's returns during the same years, his profits and losses from rentals and sales of real estate properties were as follows: Profit or (Loss)
Profit or (Loss)
Year
on Sales
on Rentals
1948
No sales
[5,035.68)
1949
No sales
(2,009.66)
1950
$ 7,915.52
(1,257.94)
1951
2,764.35
(4,884.35)
1952
49,870.83
1,168.53
1953
43,108.25
0
1954
0
0
1955
0
0
*41 According to his returns petitioner received income from other sources during these years in the following net amounts: Year
Directors Fees
Dividends
Interest
Miscellaneous
1948 $340
$5,580.92
1949
180
5,154.73
$ 43.57
$527.22
1950
320
6,326.00
84.92
1951
200
4,083.80
100.69
1952
300
2,422.30
34.76
1953
260
4,045.90
77.34
1954
340
5,845.64
327.91
1955
520
7,083.86
1,454.68
Petitioner did not claim any Federal income tax deductions for the use of the Bluebill from 1948 to 1953, inclusive. His accountant had advised him that to do so he would be only "asking for trouble" if he claimed anything more than a small part of his annual Bluebill operating expenses. In 1954, petitioner claimed deductions for expenses of operation and depreciation for the first time. These expenses were claimed to be in the amount of $1,710.78. This amount was based on 6/52nds, or six weeks' business use out of the year. In 1955, Henry employed a different accountant and his return as prepared by that accountant reflected claimed business expense of 50 percent of the Bluebill operating expenses in that year, or $8,053.36. This item was listed *42 as "publicity and public relations." In addition, he claimed one-half of the $69,722.29 loss on the sale of the boat, or $34,861.15, as a loss of business property. The deductions so claimed for 1954 and 1955 were disallowed by the respondent in his determination of deficiency herein. Petitioner incured allowable business expenses in the operation and maintenance of the yacht Bluebill in the amount of $1,250 and $800, respectively, for the taxable years 1954 and 1955. Petitioner incurred a business loss on the sale of the Bluebill in 1955 in the amount of $5,000. Opinion The questions for decision are as to the amounts, if any, of the expenses of operation of the Bluebill in 1954 and 1955 properly deductible by petitioner for those years under section 162 of the Internal Revenue Code of 1954. Also in issue is the deductibility under section 165 of part, if any, of the loss on the sale of the Bluebill in 1955. Section 162[4] provides for the deduction of all ordinary and necessary expenses incurred during the taxable year in carrying on a trade or business. Section 1.162-1(a) [5] of the Income Tax Regulations provides that the business expenses deductible *43 from gross income under section 162 include the ordinary and necessary expenditures directly connected with or pertaining to the taxpayer's trade or business. Section 165 provides for the allowance of deductions for losses sustained during the taxable year and not compensated for by insurance or otherwise, with certain specified limitations. [6]
*44 We are persuaded by the evidence that petitioner did to some extent use the Bluebill in the operation of his business. Consequently, we think the Commissioner did err in denying as deductions all of the claimed expenses in 1954 and 1955, and in not allowing the deduction of any part of the loss on the sale of the Bluebill in 1955. We are not impressed, however, with the petitioner's contention that by reason of respondent's amendment of his answer the burden of proof shifted from petitioner to respondent. The explanation appearing in the notice of deficiency was that the claimed Bluebill deductions were disallowed "for failure to establish business relationship" of the Bluebill expenditures. It did not in words state that the expenditures were unreasonable in amount or were not ordinary and necessary expenses paid or incurred in the operation of petitioner's business. Petitioner takes the position that respondent by having amended his pleadings to specifically so state now has the burden of proof. The position of petitioner is not in our opinion well taken inasmuch as the allegations set out in words in the amended pleadings were implicit in the determination of deficiency itself. *45 See C. D. Spangler, 32 T.C. 782 affd. 278 F. 2d 665. We have carefully examined and considered the evidence with reference to the ownership and operation of the Bluebill and its relationship to the business carried on by petitioner during the taxable years and, as stated above, we are persuaded that the Bluebill was to some extent used by petitioner in the taxable years in the conduct of his business and have so found. We have likewise, from examination and consideration of the evidence and to the best of our ability and judgment, determined that the amounts of operating expenditures and of the loss sustained on the sale of the Bluebill which were related to petitioner's conduct of his business were respectively $1,250 for 1954; $800 for 1955; and $5,000 loss in 1955. See Cohan v. Commissioner, 39 F. 2d 540. Decision will be entered under Rule 50. Footnotes
1. As to how these fees were reported by petitioner in his returns for 1954 and 1955 does not appear, since the returns for these years do not show as such any income from real estate activities.↩
2. The record is somewhat vague as to the use of the Bluebill by members of petitioner's immediate family. As exhibits to petitioner's deposition there are purported "logbooks" subsequently made up from purported original data or memoranda which indicate that the Bluebill was used by members of petitioner's immediate family on several occasions during the years in issue. These exhibits indicate that petitioner's mother was aboard the yacht for more than three weeks in 1954 and that his son, Bob, was aboard at least once in 1954 and 1955. In a further exhibit to his deposition, petitioner purportedly made a compilation of all guests who were aboard the Bluebill during these years but none of the entries found in the "logbooks" which concern his immediate family were carried forward to the compilation.↩
3. The term "premium dollar volume" of insurance is not defined in the record. It is not clear just what the term includes and the use of the term in the record does not indicate whether gross or net figures are involved.↩
1. Profit reported after application of $832.60 loss for 1952 was $165.90. ↩
2. 1954 represents the first year in which petitioners claimed a deduction for expenses in operating and maintaining the Bluebill. Claimed expenses were $1,710.78. ↩
3. In 1955 expenses of $8,053.36 were claimed by petitioners for cost of operating and maintaining the Bluebill. This was the year of sale of the yacht for which petitioners claimed a loss of $34,861.15, disallowed by respondent, but which accounts for a large figure under Profit or (Loss).↩
4. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - (1) a reasonable allowance for salaries or other compensation for personal services actually rendered; (2) traveling expenses (including amounts expended for meals and lodging other than amounts which are lavish or extravagant under the circumstances) while away from home in the pursuit of a trade or business; and (3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity. ↩
5. § 1.162-1 Business expenses. (a) In general. Business expenses deductible from gross income include the ordinary and necessary expenditures directly connected with or pertaining to the taxpayer's trade or business, * * *. The full amount of the allowable deduction for ordinary and necessary expenses in carrying on a business is nevertheless deductible, even though such expenses exceed the gross income derived during the taxable year from such business. * * * ↩
6. SEC. 165. LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. (b) Amount of Deduction. - For purposes of subsection (a), the basis for determining the amount of the deduction for any loss shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property. (c) Limitation on Losses of Individuals. - In the case of an individual, the deduction under subsection (a) shall be limited to - (1) losses incurred in a trade or business; (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; and * * *↩