**Leland D. PAYNE and wife, Zelma Payne, Petitioners,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**Marion T. KEY, Executor of the Estate of J. T. Jenkins, Deceased, and Myrtle Jenkins, Petitioners,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**Nos. 17643, 17644.**

United States Court of Appeals Fifth Circuit.

June 29, 1959.

No. 17644:

Charles K. Rice, Asst. Atty. Gen., Arch M. Cantrall, Chief Counsel, Claude R. Marshall, Special Atty., Internal Revenue Service, George W. Beatty, Atty., Dept. of Justice, Washington, D. C., for respondent.

No. 17643:

Charles K. Rice, Ass't. Atty. Gen., Howard A. Heffron, Acting Asst. Atty. Gen., Arch M. Cantrall, Chief Counsel, Claude R. Marshall, Special Atty., Internal Revenue Service, George W. Beatty, Lee A. Jackson, Dept. of Justice, Washington, D. C., for appellee.

Nos. 17643, 17644:

Harry Baum, Atty., Dept. of Justice, Washington, D. C., for appellee.

Wm. H. Evans, Lubbock, Texas, for petitioners.

Before HUTCHESON, Chief Judge, and RIVES and TUTTLE, Circuit Judges.

TUTTLE, Circuit Judge.

Petitioners here seek a reversal of the decision of the Tax Court which held that gain they realized from retirement of stock in several apartment corporations was taxable as ordinary income rather than as capital gains.

In 1950, Congress amended Section 117 of the Capital Gains Section of the Internal Revenue Code of 1939, 26 U.S.C.A. § 117 by excluding from the capital gains treatment of certain proceeds from retirement of capital stock gain received in liquidation or retirement of stock in a newly defined class of "collapsible" corporations.[1]

The statute defined such collapsible corporation as " * * * a corporation formed or availed of principally for the manufacture, construction, or production of property * * with a view to—

"(i) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, prior to the realization by the corporation * * * constructing * * * the property of a substantial part of the net income to be derived from such property, and

"(ii) the realization by such shareholders of gain attributable to such property."

The taxpayers here organized six corporations known respectively as Highland Place Development Company of Lubbock A., Inc., Highland Place Development Company of Lubbock B., Inc. and Highland Place Development Company, etc. with letters C.D.E. and F. appropriately substituted. These corporations were all formed with the purpose of constructing duplex living units to be

1. Section 117 (m) (2) (A) (i, ii).

financed by F.H.A. guaranteed mortgages.

Each corporation had a capital structure consisting of 90 shares of common stock, 100 shares of preferred stock, and 240 shares of "second preferred common stock." The par value of the common stock was $10.00 per share; the preferred $1.00 per share, and the second preferred common $100.00 per share.

Under the certificate of incorporation, the second preferred common stock could be retired at the end of any semi-annual fiscal period out of any funds representing earned or donated surplus or other excess cash funds (except the proceeds of secondary financing) after making provision for payment of operating expenses, the establishment of a reserve fund for replacements and payment of all currently outstanding interest and principal. However, no such stock could be retired until after the completion of the improvements on the property or before the final endorsement for mortgage insurance by the Federal Housing Commissioner. In order to qualify for F.H.A. mortgage insurance it was required that each corporation issue $100 of preferred stock to the F.H.A.

Taxpayers acquired the entire issue of second preferred common stock in exchange for land deeded by them to the six corporations. This land had cost them a total of $70,564.80.

It was agreed by the taxpayers that:
"These parties knew in advance that F.H.A. would likely issue a loan commitment for an amount equal to 90% of the total value of the project. They knew the appraisals of F.H.A. were based upon replacement cost of improvements, together with an appraisal of the actual value of the land regardless of its cost to the individuals. By building the projects as one unit, by buying in bulk and building all the houses at the same time, they hoped to retire some of the second preferred stock and thereby recover a part of their investment in the land. *It was intended from the beginning to pay to the individuals as much as possible of their land cost, and the second preferred common stock was designed for the recoupment on the part of the individuals of their expenditure for land.*"

The parties agreed before construction commenced that Jenkins would perform all the work as general superintendent of construction (that was his regular business) without fee, and that Payne would furnish all materials (from his builders supply company) at cost, "in order to insure the completion of the structures within the funds available."

The taxpayers had the land platted and accepted for incorporation in the city limits of Lubbock, Texas, which undoubtedly added a substantial increment of value to the land. In any event, after the construction was completed the corporations had cash in the sum of $134,131.35 left over after paying the cost of construction, fees and all other charges.

Shortly after completion of construction, but before the final accounting was completed, the corporations held meetings and voted to retire all the second preferred common stock, for which the entire excess sum would be paid together with some $16,000 of current income from rent, plus other cash received from sale of equipment, etc. After deducting the basis of the land at its cost to the taxpayers they reported the difference as gain from retirement of their preferred stock, claiming it was subject to capital gains treatment.

The Commissioner asserted a deficiency on the theory that these were collapsible corporations and the gain was to be treated as ordinary income. The Tax Court upheld the Commissioner's contention and the taxpayers here petition for a review of that decision.

■ The basic question here is whether in the face of testimony of the taxpayers that they arrived at their intent to *distribute gain above the cost of the land* only after construction was completed, the Tax Court could properly find that these corporations were "availed of

principally for * * * construction * * * of property * * * with a view to the sale or exchange of stock by its shareholders * * * or a distribution to [their] shareholders, prior to the realization by [them] of a substantial part of the net income to be derived from such property, and [with a view to] the realization by such shareholders of gain * * * * "

In common with the Courts of Appeals of the Fourth and Second Circuits, in Burge v. C.I.R., 4 Cir., 253 F.2d 765, and Glickman v. C.I.R., 2 Cir., 256 F.2d 108, we conclude that the Tax Court's application of the collapsible corporation statute to this situation was proper and its decision must be affirmed.

We think we need not go as far as the courts did in the two decided cases in construing the language "availed of principally for the construction of property with a view to a distribution to shareholders." The two opinions adopted the theory that if the intention and purpose of making a distribution to shareholders was formulated and followed by such actual distribution resulting in gain prior to the realization of a substantial part of the income from the property, then the corporation was "availed of" for the "proscribed purpose." While not disagreeing with this construction of the statute, we recognize that it seems to overlook the requirement by the statute that the corporation must be availed of for *construction* of property *with a view* to a distribution, etc. A respectable argument can be made that this means that unless the "view" is held before or during construction, the statute is not satisfied.

Here, however, we think the Tax Court was required to conclude as a fact that these parties had the view to making a distribution to shareholders at the time the corporations were organized. This much is actually admitted. Both parties testified that they set up the second preferred stock so that when the buildings were completed and the appraisal on the completed job would warrant a loan for more than the total cost of construction,

they hoped to turn in their second preferred common stock for the amount they had invested in land.

Taxpayer Payne was asked the question: "Would you please state to the court at the inception of your corporate structure in November of 1949, what was your intent with reference to the retirement of the retireable stocks?" He answered: "Our intention was to try to get part or all of our land cost back."

He then testified that they did not have any intention, during construction, "to recoup by stock retirement any amount more than [their] land cost."

It seems perfectly obvious that the incorporation of these companies with the view to building the houses and immediately *retire the preferred stock which represented the value of the land* would literally track the terms of the statute: "a corporation * * * availed of principally for the * * * construction * * * of property * * * with a view to * * * a distribution to its shareholders, prior to the realization by [it] of a substantial part of the net income to be derived from such property." The retirement of the preferred stock is nonetheless a distribution to shareholders even though it was not known that the payment would be greater than the amount that the land had cost the corporation. Thus the requirements of subsection (i) were satisfied.

Next, as to whether there was the requisite "view to * * * the realization by such shareholders of gain attributable to such property," we conclude that all the evidence before the Tax Court warranted it in finding that there was, prior to the completion of construction, a view to making a distribution of all available cash by the retirement of the second preferred common stock. This would, of course, comprehend a "view to the realization of gain," if the available excess was sufficient pay for the land and also include a profit, which, of course, it did.

On cross-examination taxpayer Payne was asked, "And at the time of this meeting [after construction was complete],

*and even before*, you *had* decided that you would distribute all there was, you weren't sure at that time how much there was and you inserted the figure later?" (Emphasis added.)

He answered, "Yes, I believe it says in here we would distribute all there was available, all that there was left and we inserted the amount that was actually left at a later date when we actually determined that amount."

■ We think the testimony that taxpayers had no intent prior to June, 1950, to recoup any more than their land cost does not require the Tax Court to hold that the corporation was not formed with a view to making such recoupment, since it is clear that the corporate set up was designed to facilitate some recoupment; that they expected the loan to supply an excess of funds over cost; that before the June meeting they had decided they would distribute all there was; and that immediately following creation of the surplus they did in fact recoup the amount which here constitutes the gain. Even if the testimony had been categorical and undisputed the court could reject it if the other circumstances supported a contrary finding as to intent. See Carmack v. Commissioner, 5 Cir., 183 F.2d 1; Cohen v. Commissioner, 2 Cir., 148 F.2d 336.

Taxpayers make the additional point that they are not subject to the above quoted statute because of the limitations contained in Section 117(m)(3) which provides:

"In the case of gain realized by a shareholder upon his stock in a collapsible corporation * * *.

"B. This subsection shall not apply to the gain recognized during a taxable year unless more than 70 per centum of such gain is attributable to the property so manufactured, constructed, or produced."

Taxpayers contend that the availability of the excess cash from the loan resulted in large part because the fair market value of the unimproved land was some $32,000 more than it cost and the proceeds from the 90% loan on this increment of value exceeded 30% of the total gain received by taxpayers.

■ The basic difficulty with the taxpayers' argument derives, we think, from their misinterpretation of the term "gain." What the statute refers to as "gain" is what is sometimes called "profit." It does not mean the increase or gain in the value of the property. The section treats of how to tax a "gain from the sale or exchange of stock." Subsection B says such "gain" shall not be taxed as ordinary income unless more than 70% of such "gain" is attributable to the property so constructed. All of this particular gain is derived from the redemption (sale or exchange) of taxpayers' stock. The funds which provided it were a loan secured by the improved property. The only basis for the making of F.H.A. loans was the construction of rental property. Without the buildings there would have been no loan. Without the loan there would have been no redemption of the stock. We think the gain was "attributable" to the property constructed. The same conclusion was reached in Glickman v. C.I.R., 2 Cir., 256 F.2d 108, where it was said on page 111:

"The petitioners further contend that the gains recognized on the cash distribution and the sale of stock are not within § 117(m) because at least 30% of those gains was attributable to appreciation of the land 'apart from building construction.' This is far too narrow an interpretation of the statute to be accepted. As to the cash distribution the Tax Court correctly held that all of it was directly attributable to the constructed property, since it was paid out of the funds advanced to [the] Mott [corporation] on the F.H.A. mortgage."

■ Finally, the petitioners contend that there was no factual basis for a finding by the Tax Court that the redemption of the stock was made prior to the realization by the corporations of a substantial part of the net income to be de-

rived from such property. It appears that the Government has accepted too difficult a burden in supporting the Tax Court's holding. A careful study of this section seems clearly to require only that the corporations be availed of for construction etc. with a view to a distribution * * * prior to the realization of a substantial portion, etc. If the corporation is owned or availed of with a view to making the distribution prior to realization of substantial income, it seems clear that it is not necessary for the commissioner to prove that such distribution was actually made prior to such realization. However, the parties assumed there must be a finding that in fact this is what was done. On that basis, which we accept for the purpose of this discussion, rather than decide the point on a theory not advanced on argument, we conclude the Tax Court could properly find on the record that a substantial part of the income of the corporations remained to be realized over the 35 remaining years of their expected life.

The principles heretofore announced apply equally to the gain realized by Payne from the redemption of his second preferred common stock in the Big Spring venture. The propriety of the Tax Court's finding that these corporations had a view during construction to making a payment of profits by redeeming the stock was even clearer here, because Payne had already completed the transaction and recouped his investment plus profit from the Highland Place corporations long before construction at Big Spring was completed. He obviously could not say it had not occurred to him to take down the profit by redeeming the second preferred common in Big Spring, since he had done it about six months previously as to Highland Place.

We find the decisions of the Tax Court to be in accord with sound reason, and amply supported by the decisions of other courts.

The decisions are affirmed.

HUTCHESON, Chief Judge (specially concurring).

I concur in the conclusion of the majority that the decision of the Tax Court should be affirmed. I concur too in what is said in the opinion in denying taxpayers' claims that, because of the limitation in Subsec. (m)(3)(B), they are not subject to the invoked statute. It seems to me, though, that the undisputed facts bring these cases so clearly within both the letter and the spirit of the collapsible statute and the mischief it was enacted to prevent and relieve against and the taxpayers' three claims of error are so basically lacking in substance that, without straining for reasons, it should be downrightly said so.

I think Judge Parker, in his opinion in Burge v. C.I.R., 4 Cir., 253 F.2d 765, at page 767 correctly stated the basic considerations obtaining here:

" * * * The word 'collapsible' considered apart from its context would be somewhat misleading; but there can be no question, we think, as to what Congress meant by a 'collapsible corporation' as used in the statute. That term was used to describe a corporation which is made use of to give the appearance of a long term investment to what is in reality a mere venture or project in manufacture, production or construction of property, with the view of making the gains from the venture or project taxable, not as ordinary income, as they should be taxed, but as long term capital gains. Because the basic type of transaction which gave rise to the legislation involved the use of temporary corporations which were dissolved and their proceeds distributed after tax avoidance had been accomplished, the term 'collapsible corporation' was employed to describe the corporations used for this form of tax avoidance; but the statute was drawn in broad general terms to reach the abuse which had arisen, whatever form it might take.

"The committee reports describe a collapsible corporation as 'a device whereby one or more individuals attempt to convert the profits from their participation in a project from income taxable at ordinary rates to long term capital gain taxable only at a rate of 25 per cent.' "

In the light of this statement and of the clearly expressed purpose in Section 117(m)(1) to prevent gains from sale or exchange of stock of a "collapsible" corporation from being treated as gains from the sale or exchange of a capital asset, on this record it seems to me that appellants' points of error do not go to the heart of the question, whether the corporations in question were collapsible within the statute, but concern themselves only with quibbling over matters having no real bearing on the determination of the question in the case.