**C. D. SPANGLER and Veva C. Spangler, Petitioners,**

**v.**

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 8005.**

United States Court of Appeals Fourth Circuit.

Argued Jan. 18, 1960.

Decided April 18, 1960.

Herman Wolff, Jr., Raleigh, N. C. (Elton B. Taylor, Charlotte, N. C., and John J. Geraghty, Raleigh, N. C., on brief), for petitioners.

Karl Schmeidler, Atty., Dept. of Justice, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Harry Baum, and David O. Walter, Attys., Dept. of Justice, Washington, D. C., on brief), for respondent.

Stanley Worth, Washington, D. C. (Edward S. Smith, Washington, D. C., Claude C. Pierce, Jr., Greensboro, N. C., Blair, Korner, Doyle & Worth, Washington, D. C., and McLendon, Brim, Holderness & Brooks, Greensboro, N. C., on brief), as amici curiae.

Before SOBELOFF, Chief Judge, and SOPER and HAYNSWORTH, Circuit Judges.

SOBELOFF, Chief Judge.

The "collapsible corporation" provisions of the internal revenue laws are the principal subject-matter of this petition for review. The Commissioner denied capital gains treatment which the taxpayer claimed for certain profits realized by him in the redemption of his stock in two building corporations which he had been instrumental in forming. The Tax Court, in an opinion at 32 T.C. 782, reviewed by the full court, upheld the Commissioner's action without dissent. For reasons which will be stated, we affirm its decision.

Taxpayer, C. D. Spangler,[1] is a building contractor living in Charlotte, North Carolina. From 1949 to the present, he has owned 51% of the capital stock of C. D. Spangler Construction Company, a North Carolina corporation engaged in the general contracting business. The remaining 49% of the stock is owned by members of his immediate family. In 1949 and 1950 the taxpayer organized two corporations, Double Oaks Apartments, Inc., and Newland Road Apartments, Inc., to construct two low rent apartment projects with borrowed funds insured by the Federal Housing Administration.

For those who are interested, the opinion of the Tax Court relates the facts in comprehensive detail; we shall set forth only what is necessary for an understanding of the questions raised here.

### Double Oaks Project

On February 28, 1949, the Federal Housing Commissioner entered into a commitment for mortgage insurance in the amount of $2,233,700.00 for a rental housing project to be built in Charlotte, North Carolina. The taxpayer was designated as the sponsor; Double Oaks

---

1. References to the taxpayer are to C. D. Spangler. His wife is a party only because a joint return was filed.

Apartments, Inc., a proposed or prospective corporation, was specified as the mortgagor; and a mortgagee bank was named.

Double Oaks was organized under the laws of North Carolina on May 10, 1949, and on June 10, 1949, the corporation issued stock for cash at par as follows:

| Type of Stock | No. of Shares | Par Value | Name in Which Issued |
|---|---|---|---|
| 5% Preferred | 100 | $ 100.00 | Federal Housing Administration |
| A Common | 300 | 300.00 | C. D. Spangler Construction Company |
| A Common | 100 | 100.00 | Fred L. Taylor |
| B Common | 2,194.01 | 219,401.00 | William G. Lyles, Bissett, Carlisle and Wolf (Architects) |
| B Common | 136.4 | 13,640.00 | C. D. Spangler Construction Company |
| B Common | 750 | 75,000.00 | Fred L. Taylor |

The above-mentioned Fred L. Taylor, a resident of Pinehurst, North Carolina, does not appear to be related to the petitioner or connected with the Spangler Construction Company. On or about January 26, 1950, the 750 shares of Class B Common Stock originally issued to Taylor were acquired by the C. D. Spangler Construction Company for $75,000.00 and on May 24, 1950, it surrendered this stock to Double Oaks for redemption, and received $75,000.00 in cash. On or about November 2, 1950, the 100 shares of Class A Common Stock originally issued to Fred L. Taylor were redeemed for $100.00. Precisely what role Taylor played in this enterprise, by his entry and exit, is not made clear in the record, nor could counsel at the hearing of the appeal suggest an explanation.

William G. Lyles, Bissett, Carlisle, and Wolf, an architectural firm, maintained its principal office at Columbia, South Carolina. The FHA project analysis and commitment for Double Oaks contemplated that architect fees in the amount of $112,376.00 and builders' fees in the amount of $107,025.00, a total of $219,-401.00, would be paid in stock. A total of 2,194.01 shares of Double Oaks Class B Common Stock, representing the aggregate architect and builders' fees, were issued to the architects. Why the stock representing "builders' fees" was issued to the architects, in addition to the stock representing their professional fees, is nowhere explained. On August 8, 1949, all of the 2,194.01 shares, having a par value of $219,401.00, were sold to C. D. Spangler individually for $16,570.00. The taxpayer offered no explanation for this unusual bargain.

Double Oaks acquired from the taxpayer on June 10, 1949, a ground lease for a term of 99 years on the tract of land upon which the apartment house was to be built. The tenant agreed to a basic rental of $10,000.00 to be paid annually to the taxpayer after completion of the improvements.

Construction began on or about June 10, 1949. On that date, Double Oaks entered into a contract with C. D. Spangler Construction Company in which the latter agreed to do the construction for a lump sum of $2,140,493.00. It was also provided in the contract that the petitioner should furnish an indemnity agreement to Double Oaks in the amount of $223,370.00 to assure completion. Double Oaks paid Spangler Construction Company the total amount specified in the contract in several installments over the period from June, 1949, to January, 1950. Then, on May 24, 1950, the Construction Company voluntarily paid back to Double Oaks $171,239.44 as a refund on the construction contract. No expla-

nation is to be found in the record for this generosity.

On the very same day, May 24, 1950, the petitioner surrendered for redemption 1,844.01 shares of his Class B Common Stock to Double Oaks and received in exchange $184,401.00. On December 20, 1950, he redeemed his remaining 350 shares of Class B Common Stock for $35,000.00. Thus, petitioner received a total of $219,401.00 for the shares that he had purchased from the architects for $16,570.00. This $219,401.00 was the exact amount which had been contemplated in the FHA project analysis as the total architect and builders' fees.

## Newland Road Project

A not dissimilar course of events occurred in the second of the newly formed corporations. Sometime prior to February 28, 1950, the taxpayer sponsored another housing project at Charlotte, North Carolina, called Newland Road Apartments, Inc., for which the FHA committed itself to guarantee a loan of $824,-000.00. On April 1, 1950, the Newland Road Corporation issued stock as follows:

| Type of Stock | No. of Shares | Par Value | Name in Which Issued |
|---|---|---|---|
| Preferred | 100 | $ 100.00 | Federal Housing Administration |
| A Common | 300 | 300.00 | C. D. Spangler Construction Company |
| B Common | 148.03 | 14,803.00 | William G. Lyles, Bissett, Carlisle and Wolf (Architects) |

The shares were issued to the architects in consideration for their services; they also received $3,220.00 in cash from Newland Road on May 26, 1950. Three days later, on May 29, 1950, Spangler purchased from the architects the 148.03 shares, having a par value of $14,803.00, for $1,000.00. He surrendered these shares to Newland Road for redemption on December 20, 1950, and received in exchange $14,803.00.

The outcome of the present controversy turns upon the nature of the gains derived by the taxpayer from the redemption of his stock in these corporations.

## Burden of Proof

■ Taxpayer contends, initially, that the burden of proof was on the Commissioner to show that all the requisites of the collapsible corporation section, 117 (m), 26 U.S.C.A. § 117(m),[2] were met.

2. The relevant portions of the statute follow:

"§ 117. Capital Gains and Losses.
*  *  *  *  *

"(m) Collapsible corporations.

"(1) Treatment of gain to shareholders. Gain from the sale or exchange (whether in liquidation or otherwise) of stock of a collapsible corporation, to the extent that it would be considered (but for the provisions of this subsection) as gain from the sale or exchange of a capital asset held for more than 6 months, shall, except as provided in paragraph (3), be considered as gain from the sale or exchange of property which is not a capital asset.

"(2) Definitions.

"(A) For the purposes of this subsection, the term 'collapsible corporation' means a corporation formed or availed of principally for the manufacture, construction, or production of property, for the purchase of property which (in the hands of the corporation) is property described in subsection (a) (1) (A), or for the holding of stock in a corporation so formed or availed of, with a view to—

"(i) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, prior to the realization by the corporation manufacturing, constructing, producing, or purchasing the property of a substantial part of the net income to be derived from such property, and

"(ii) the realization by such shareholders of gain attributable to such property.
*  *  *  *  *

"(3) Limitations on application of subsection. In the case of gain realized by

In support of this contention, Spangler relies on Rule 32 of the Rules of Practice of the Tax Court, 26 U.S.C.A. § 7453, which provides that "in respect of any new matter pleaded in his answer" the burden shall be on the Commissioner. The Tax Court, construing its own rule, in an opinion reviewed by the full court, held it inapplicable here.

The notice of deficiency stated that the amount in question was "ordinary income," taxable under section 22(a), 26 U.S.C.A. § 22(a). This section embraces "gains or profits and income derived from any source whatever." In his amended answer, filed November 13, 1957, more than two months before the trial, the Commissioner alleged, as an additional reason, that "ordinary income" was realized within the provisions of section 117(m).

As the Tax Court points out in its opinion, the deficiency notice originally was in broad terms. There was no inconsistency or conflict between the notice and the Commissioner's later answer to the taxpayer. We therefore agree that the burden of proof did not shift to the Commissioner, and the cases dealing with this issue, with the exception of Thomas Wilson, 1956, 25 T.C. 1058 which the Tax Court has now overruled, fully support this conclusion. Sorin v. Commissioner, 29 T.C. 959, affirmed per curiam after full argument, 2 Cir., 1959, 271 F.2d 741; Payne v. Commissioner, 30 T.C. 1044, affirmed without discussion of this point, 5 Cir., 1959, 268 F.2d 617; Sidney v. Commissioner, 30 T.C. 1155, 2 Cir., 1960, 273 F.2d 928. Furthermore, the tax-

payer went to trial without any possible misapprehension as to the Commissioner's position and was in no way prejudiced. Even if the burden of proof had been shifted to the Commissioner, we would, on this record, not reach a different result.

### The 70% Requirement

Section 117(m) does not apply to the gain recognized during a taxable year unless more than 70% of such gain is "attributable to the property" manufactured, constructed, or produced. Taxpayer insists that more than 30% of the gain involved was attributable to other factors, such as the construction contract refund from the Construction Company to Double Oaks, rentals from the properties, and off-site improvements. In Burge v. Commissioner, 253 F.2d 765, 769–770, this court, answering a similar contention, stated:

"Equally specious is the contention that because the distribution was made from the excess of the construction loan it was not attributable to the property being constructed. The answer, of course, is that without the construction of the property there would have been no construction loan and no excess therein to be distributed to shareholders of the corporation."

We think that here also the taxpayer's argument is without merit since any gains arising from the construction contract refund, rentals, and off-site improvements are clearly attributable to the property constructed.

a shareholder upon his stock in a collapsible corporation—

"(A) this subsection shall not apply unless, at any time after the commencement of the manufacture, construction, or production of the property, or at the time of the purchase of the property described in subsection (a) (1) (A) or at any time thereafter, such shareholder (i) owned (or was considered as owning) more than 10 per centum in value of the outstanding stock of the corporation, or (ii) owned stock which was considered as owned at such time by another shareholder who then owned (or was considered as own-

ing) more than 10 per centum in value of the outstanding stock of the corporation;

"(B) this subsection shall not apply to the gain recognized during a taxable year unless more than 70 per centum of such gain is attributable to the property so manufactured, constructed, produced, or purchased; and

"(C) this subsection shall not apply to gain realized after the expiration of three years following the completion of such manufacture, construction, production, or purchase."

### The Claimed Absence of Net Income

■ Another element of the statutory definition of a "collapsible corporation" is that the redemption, sale, or distribution must occur "prior to the realization by the corporation * * * of a substantial part of the net income to be derived from the property. * * *" The taxpayer argues that the amounts he received in redemption are not within this definition since it is "likely that the corporations will never realize a net income." However, such speculation does not make the statute inapplicable. As the court below aptly observed:

"The net income to be derived from the properties here would consist of rental income over the life of the properties of the lease. It seems clear, therefore, that at the times of redemption the corporations had not realized substantial parts of the net income to be derived from the properties."

Furthermore, the statute does not require that net income from the property should in fact subsequently develop, if the corporation has been availed of with a view to making the distribution prior to the corporation's realization of a substantial part of net income. Payne v. Commissioner, 5 Cir., 1959, 268 F.2d 617.

### The Requisite "View"

■ Still another element of the statutory definition of a "collapsible corporation" is that it be *formed or availed of* principally for the manufacture, construction, or production of property *with a view to* realization by its shareholders of the gain attributable to the property through the sale or exchange of stock by its shareholders prior to the realization of a substantial part of the net income to be derived from the property. The taxpayer contends that under the Treasury Regulations the requisite view must have existed during the construction of the property, and the view could not have existed at that time in the instant case because the redemptions were made several months after completion of construction.

Neither the decisional law nor the Treasury Regulations support the taxpayer's argument. In Burge v. Commissioner, 253 F.2d 765, 769, we said:

"It is not necessary that the 'view' exist at the time the corporation is formed. It is sufficient that it exist when the corporation is 'availed of'; and the corporation was availed of here to dispose of all interest that the shareholders had in the project by sale or exchange of stock before it had realized any substantial part of the net income to be derived from the property."

To the same effect are Glickman v. Commissioner, 2 Cir., 1958, 256 F.2d 108 and Sidney v. Commissioner, 2 Cir., 1960, 273 F.2d 928.

The record in this case, particularly illustrated by the steps taken in connection with the architects' stock, powerfully suggests that the requisite view existed when the corporations were formed; the proof is convincing that this view existed when the corporations were "availed of." Even under the Treasury Regulations, upon which petitioner places primary reliance, the requirements of section 29.117–11(b) of Regulations 111 are met if the "view" exists at any time during construction or *thereafter*, provided that the distribution in the latter instance is attributable to "circumstances which reasonably could be anticipated at the time of * * * construction. * * *" As to both Double Oaks and Newland Road, it was abundantly clear from the circumstances, before the completion of construction, that there would be excess loan proceeds; and in each case the taxpayer placed himself in a position to obtain this excess by redemption of his stock.

### Retroactivity

After the Tax Court's decision, taxpayer moved to reopen the case for further trial, asserting that section 117(m), enacted September 23, 1950, cannot be applied retroactively to the distribution by Double Oaks on May 24, 1950, under the Due Process Clause of the Fifth Amendment. The Tax Court did not err

in denying this motion. No sufficient reason has been given for not raising this issue at the trial. In any event, if we look to the merits of the point, the taxpayer's argument is fully answered by a recent decision of our brethren of the Second Circuit in a case not unlike the present one. Sidney v. Commissioner, 2 Cir., 1960, 273 F.2d 928.[3]

### Burge v. Commissioner

Taxpayer seeks to distinguish our decision in Burge v. Commissioner, 4 Cir., 1958, 253 F.2d 765, on the ground that the taxpayer there completely divested himself of his interest in the corporation, whereas in this case the taxpayer continues to own stock in the corporations in question by virtue of his ownership of stock in the C. D. Spangler Construction Company. We think this distinction too finespun, and it is fully rebutted by the very language of Burge:

"The word 'collapsible' considered apart from its context would be somewhat misleading; but there can be no question, we think, as to what Congress meant by a 'collapsible corporation' as used in the statute. That term was used to describe a corporation which is made use of to give the appearance of a long term investment to what is in reality a mere venture or project in manufacture, production or construction of property, with the view of making the gains from the venture or project taxable, not as ordinary income, as they should be taxed, but as long term capital gains. Because the basic type of transaction which gave rise to the legislation involved the use of temporary corporations which were dissolved and their proceeds distributed after tax avoidance had been accomplished, the term 'collapsible corporation' was employed to describe the corporations used for this form of tax avoidance; but the statute was drawn in broad general terms to reach the abuse which had arisen, whatever form it might take." 253 F.2d 765, 767.

See also Glickman v. Commissioner, 2 Cir., 1958, 256 F.2d 108; Abbott v. Commissioner, 3 Cir., 1958, 258 F.2d 537; August v. Commissioner, 3 Cir., 1959, 267 F.2d 829; Payne v. Commissioner, 5 Cir., 1959, 268 F.2d 617; Sidney v. Commissioner, 2 Cir., 1960, 273 F.2d 928.

### Section 115(d)

It is further insisted that the Commissioner's regulations under section 117 (m) are invalid (1) to the extent that transactions under section 115(d), 26 U. S.C.A. § 115(d),[4] are erroneously brought within the ambit of section 117(m), and (2) in "treating as a collapsible corporation any corporation which obtained a loan in excess of the adjusted basis of the property and thereafter made any kind of distribution to its stockholders."

■■ The essence of section 117(m) is to limit the area of capital gains treatment, by excluding profits derived by the taxpayer through the use of collapsible corporations. Section 117(m) was expressly designed to treat as ordinary income profits which would otherwise be capital gains under section 115(d) or other sections where, as here, the corporation making the distribution is resorted to for the purpose of camouflaging

---

3. See, generally, the excellent treatment of this subject in Hochman, The Supreme Court and the Constitutionality of Retroactive Legislation, 73 Harv.L.Rev. 692 (1960).

4. "§ 115. Distributions by corporations
\* \* \* \* \*

"(d) Other distributions from capital. If any distribution made by a corporation to its shareholders is not out of increase in value of property accrued before March 1, 1913, and is not a dividend, then the amount of such distribution shall be applied against and reduce the adjusted basis of the stock provided in section 113, and if in excess of such basis, such excess shall be taxable in the same manner as a gain from the sale or exchange of property. This subsection shall not apply to a distribution in partial or complete liquidation or to a distribution which, under subsection (f) (1), is not treated as a dividend, whether or not otherwise a dividend."

a taxpayer's business income to give it the appearance of an investment. The very language of the section discloses that it applies to all gain from the sale or exchange of stock of a collapsible corporation "to the extent that it would be considered (*but for the provisions of this subsection*) as gain from the sale or exchange of a capital asset held for more than 6 months" (emphasis supplied), and it requires such gain to be considered ordinary income.

■ As for taxpayer's complaint that the regulations, particularly section 29.-117–11(e), Example (1),[5] lacked support in the law in deeming a corporation collapsible if it obtained a loan in excess of the adjusted basis of property and thereafter made a distribution to its shareholders, we think it suffices to answer that if the other requirements of section 117(m) are present, the court is free to conclude that such excess, whether channelled to the taxpayer through a refund, a redemption, or in any other form, is gain "attributable to such property." Burge v. Commissioner, 4 Cir., 1958, 253 F.2d 765; Glickman v. Commissioner, 2 Cir., 1958, 256 F.2d 108; Payne v. Commissioner, 5 Cir., 1959, 268 F.2d 617. Furthermore, in Burge, Judge Parker had this to say about the example of the regulations in question:

"Treasury Regulations 111, sec. 29.117–11(e), Example 1, is directly in point and clearly sustains the action of the Commissioner here. That regulation is important as an administrative construction of the statute and may not be lightly disregarded. Commissioner of Internal Revenue v. South Texas Lumber Co., 333 U.S. 496, 501, 68 S.Ct. 695, 698, 92 L.Ed. 831. As said by the Supreme Court in the case cited:

" 'This Court has many times declared that Treasury regulations must be sustained unless unreasonable and plainly inconsistent with the revenue statutes and that they constitute contemporaneous constructions by those charged with administration of these statutes which should not be overruled except for weighty reasons. See, e. g., Fawcus Machine Co. v. United States, 282 U.S. 375, 378, 51 S.Ct. 144, 145, 75 L.Ed. 397.' " 253 F.2d 765, 770.

---

5. Example (1) reads as follows:
   "On January 2, 1951, A formed the W Corporation and contributed $50,000 cash in exchange for all of the stock thereof. The W Corporation borrowed $900,000 from a bank, the loan being insured by the Federal Housing Authority, and used $800,000 of such sum in the construction of an apartment house on land which it purchased for $50,000. The apartment house was completed on December 31, 1951. On December 31, 1951, the corporation, having determined that the fair market value of the apartment house, separate and apart from the land, was $900,000, made a distribution (permitted under the applicable state law) to A of $100,000. At this time, the fair market value of the land was $50,000. As of December 31, 1951, the corporation has not realized any earnings and profits. In 1952, the corporation began the operation of the apartment house and received rentals therefrom. The corporation has since continued to own and operate the building. The corporation reported on the basis of the calendar year and cash receipts and disbursements.

"Since A received a distribution and realized a gain attributable to the building constructed by the corporation, since, at the time of such distribution, the corporation has not realized a substantial part of the net income to be derived from such building, and since the construction of the building was a substantial activity of the corporation, the W Corporation is considered a collapsible corporation under (d) (2) of this section. The provisions of section 117(m) (3) do not prohibit the application of section 117(m) (1), (2) (A). Therefore, the distribution, if and to the extent that it may be considered long-term capital gain rather than ordinary income without regard to section 117(m), will be considered ordinary income under section 117(m) (1).

"In the event of the existence of additional facts and circumstances in the above case, the corporation, notwithstanding the above facts, might not be considered a collapsible corporation. See (b) and (d) (1) of this section."

### The "Basis" Issue

There remains for consideration the issue of whether $49,678.00 which the taxpayer paid to his Construction Company for off-site improvements in connection with the Double Oaks project was an added cost of the land, which he owned, or of his stock in Double Oaks. These improvements, although called "off-site," appear to have been, for the most part, upon the very site of the project, or adjacent thereto, and, in every practical sense, improvements to the land itself. The Tax Court held that the payment was an additional cost of the land which taxpayer leased to Double Oaks, and we would not be warranted in calling this finding clearly erroneous.

Affirmed.