*Decision will be entered under Rule 155.*

IRA S. GREENE AND ROBIN C. GREENE, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 32552-85.          Filed February 5, 1987.

*Elliot I. Miller,* for the petitioners.
*Robert J. Foley,* for the respondent.

OPINION

TANNENWALD, *Judge*: Respondent determined a deficiency of $53,202.25 in petitioners' 1981 Federal income tax

---

based on the disallowance of certain deductions in respect of recycling equipment.

This case is before us on petitioners' motion for summary judgment. It is one of a number of cases involving the same or similar arrangements in respect of the impact of the safe-harbor leasing provisions of section 168(f)(8) [1] on leases of such equipment. The Court is in the process of coordinating the trial of one or more of such cases and it is clear that our disposition of the within motion will have a bearing on those cases.

Rule 121(b) provides that a motion for summary judgment is to be granted if "there is no genuine issue as to any material fact and * * * a decision may be rendered as a matter of law." The burden of proof is on the moving party, and we are required to view the factual materials and inferences to be drawn therefrom in the light most favorable to the party opposing the motion. *Casanova Co. v. Commissioner*, 87 T.C. 214, 217 (1986). We begin by setting forth a summary of the factual background for our decision—a background with which the parties appear to be in agreement for the purposes of this motion but which may be challenged, modified, or amplified in the event of trial.

Petitioners are limited partners in the Resource Reclamation Associates limited partnership (hereinafter RRA). RRA is the entity which passed through to petitioners the disallowed losses and tax credits at issue in this case.

RRA is a lessee of rights in seven Sentinel EPE recyclers (recyclers), which are manufactured by Packaging Industries Group, Inc. (PI), of Hyannis, Massachusetts. The recyclers are designed to enable converters of waste polyethylene foam and film to recycle the scrap into a more densified form, which can then be further processed to produce resin pellets useable in industry.

According to the RRA offering memorandum, after a "sale" of the recyclers from PI to Ethynol Cogeneration, Inc. (ECI), for $534,199 in cash and a 12-year nonrecourse promissory note in the amount of $6,332,801, ECI would then immediately sell the recyclers to F & G Equipment

---

[1] All section references are to the Internal Revenue Code of 1954 as amended and in effect during the year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Corp. (F & G) for $619,466 in cash and a partial recourse promissory note in the amount of $7,519,201. The note was to be recourse to the extent of 10 percent of its face value, but the recourse portion was to be payable only after the nonrecourse portion was satisfied. Each of these two notes carried a stated monthly repayment amount of $108,571, with the first payment due 8 months after closing.

Upon its purchase of the recyclers, F & G would lease the equipment to RRA for 12 years for a monthly lease amount of $108,571, with 7 months of the lease payments to be prepaid. RRA would then sublease or license the recyclers to First Massachusetts Equipment Corp. (FMEC) [2] for 12 years at a guaranteed minimum royalty of $108,571 per month, beginning with the seventh month of the 12-year period, plus a prepaid $25,000 nonrefundable advance royalty payment. After the recyclers had been placed in service, FMEC would be required to pay RRA additional royalties based on profits. FMEC would then sublease or sublicense the recyclers back to PI on a month-to-month basis, subject to most of the terms of the sublease/license between RRA and FMEC. The foregoing transactions were formally implemented in accordance with the terms set forth in the RRA offering memorandum.

Section 168(f)(8), in effect for the year at issue, provides in pertinent part:

(8) SPECIAL RULE FOR LEASES.—

(A) IN GENERAL.—In the case of an agreement with respect to qualified leased property, if all of the parties to the agreement characterize such agreement as a lease and elect to have the provisions of this paragraph apply with respect to such agreement, and if the requirements of subparagraph (B) are met, then, except as provided in subsection (i), for purposes of this subtitle—

(i) such agreement shall be treated as a lease entered into by the parties (and any party which is a corporation described in subparagraph (B)(i)(I) shall be deemed to have entered into the lease in the course of carrying on a trade or business), and

(ii) the lessor shall be treated as the owner of the property and the lessee shall be treated as the lessee of the property.

(B) CERTAIN REQUIREMENTS MUST BE MET.—The requirements of this subparagraph are met if—

(i) the lessor is—

---

[2]According to the RRA Offering Memorandum, FMEC was a newly formed corporation organized by John D. Bambara, who along with his wife and daughters, owned 100 percent of the shares of PI.

(I) a corporation (other than an S corporation or a personal holding company (within the meaning of section 542(a))) which is not a related person with respect to the lessee,

(II) a partnership all of the partners of which are corporations described in subclause (I), or

(III) a grantor trust with respect to which the grantor and all beneficiaries of the trust are described in subclause (I) or (II),

(ii) the minimum investment of the lessor—

(I) at the time the property is first placed in service under the lease, and

(II) at all times during the term of the lease, is not less than 10 percent of the adjusted basis of such property, and

(iii) the term of the lease (including any extensions) does not exceed the greater of—

(I) 120 percent of the present class life of the property, or

(II) the period equal to the recovery period determined with respect to such property under subsection (i)(2).

(C) NO OTHER FACTORS TAKEN INTO ACCOUNT.—If the requirements of subparagraphs (A) and (B) are met with respect to any transaction described in subparagraph (A), no other factors shall be taken into account in making a determination as to whether subparagraph (A)(i) or (ii) applies with respect to such transaction.

Petitioners take the position that the assumed facts show that they have literally complied with all of the foregoing provisions and that such literal compliance entitles them to the benefits which flow from section 168(f)(8), because subparagraph (C) thereof and the accompanying legislative history establish that literal compliance with the provisions of section 168(f)(8) is sufficient, irrespective of the presence or absence of business purpose, economic substance, profit objective, tax-avoidance motive, or other potentially adverse elements. Respondent, with one exception (see pp. 384-385 *infra*) does not dispute petitioners' assertion of formal compliance but argues that the transactions described above were, either in whole or in part, "shams" and that, as a consequence, such formal compliance is insufficient to permit petitioners to obtain the benefits of section 168(f)(8).

Essentially, respondent's position has as its foundation the assertion that, irrespective of the validity of petitioners' claim that the elements of business purpose, economic substance, profit objective, or tax-avoidance motive are irrelevant in determining whether the lease between F & G and RRA meets the requirement of section 168(f)(8), such elements may be taken into account in determining whether

the transactions which surround the lease and to which the lease was directly related were "shams." In this context, the roles of, and arrangements between and among, PI, ECI, and F & G, entities which were part of the transactional pattern before RRA, as well as those of FMEC and PI which were part of the transactional pattern after RRA, become, according to respondent, highly relevant, as do the valuations of the equipment and the nature of the financial terms of said arrangements. As a consequence of the foregoing, respondent argues that various factual questions exist which can only be fleshed out by live testimony of witnesses, and particularly cross-examination. For the reasons hereinafter set forth, we agree with respondent.

On its face, subparagraph (C) and the legislative history seem to support petitioners' position. The pertinent legislative history of the Economic Recovery Tax Act of 1981, Pub. L. 97-34, 95 Stat. 172 (hereinafter the 1981 Act), is reflected in the following explanation in the Conference Committee report (H. Rept. 97-215 (Conf.) (1981), 1981-2 C.B. 481, 492-493):

*Leasing*

*House bill.*—Under present IRS guidelines, a transaction is characterized as a lease if (1) the lessor's minimum at-risk investment in the property throughout the lease term is 20 percent of cost; (2) the lessor has a positive cash flow and a profit from the lease independent of tax benefits; (3) the lessee does not have a right to purchase the property at less than fair market value; (4) the lessee does not have an investment in the lease and does not lend any of the purchase costs of the owner, and (5) use of the property at the end of the lease term by a person other than the lessee must be commercially feasible.

The House bill creates a safe harbor that guarantees that a transaction will be characterized as a lease for purposes of allowing investment credits and cost recovery allowances to the nominal lessor. * * *

\*       \*       \*       \*       \*       \*       \*

If a transaction meets the above requirements, the transaction will be treated as a lease and the parties of the transaction will be treated as lessor and lessee as stipulated in their agreement. The following factors will therefore not be taken into account in determining whether a transaction is a lease:

(1) whether the lessor or lessee must take the tax benefits into account in order to make a profit from the transaction;

(2) the fact that the lessee is the nominal owner of the property for state or local law purposes (e.g., has title to the property) and retains the

burdens, benefits, and incidents of ownership (such as payment of taxes and maintenance charges with respect to the property);

(3) whether or not a person other than the lessee may be able to use the property after the lease term;

(4) the fact that the property may (or must) be bought or sold at the end of the lease term at a fixed or determinable price that is more or less than its fair market value at that time;

(5) the fact that the lessee or related party has provided financing or has guaranteed financing for the transaction (other than for the lessor's minimum 10-percent investment); and

(6) the obligation of any person is subject to any contingency or offset agreement.

*    *    *    *    *    *    *

*Senate amendment.*—The Senate amendment is the same as the House bill. [3]

*Conference agreement.*—In general, the conference agreement follows the House bill and Senate amendment. However, several clarifications are made. * * * The conferees intend no change with respect to the factors that will not be considered in determining whether a transaction is a lease transaction under the safe harbor, even though the list of factors is not contained in the final language. * * *

## The General Explanation of the 1981 Act, dated December 31, 1981, and prepared by the Staff of the Joint Committee on Taxation contains the following:

The new provision is a significant change overriding several fundamental principles of tax law. Traditionally, the substance of a transaction rather than its form controls the tax consequences of a transaction. In

---

[3]The Senate provision (S. Rept. 97-144 (1981), 1981-2 C.B. 412, 432-433) is explained as follows:

"The committee bill creates a safe harbor that guarantees that a transaction will be characterized as a lease for the purposes of allowing investment credits and capital cost recovery allowances to the nominal lessor. * * * "

*    *    *    *    *    *    *

"If a transaction meets the above requirements, it will not be scrutinized to determine whether the transaction would be, absent this safe-harbor provision, a lease, a sale, a financing, or some other type of transaction. The transaction will be treated as a lease and the parties to the transaction will be treated as lessor and lessee as stipulated in their agreement. The following factors will therefore not be relevant to the characterization of a safe-harbor transaction as a lease: whether or not the lessor's deriving a profit or cash flow from the transaction depends upon the tax benefits of ownership; the fact that the lessee is the nominal owner of the property for state or local law purposes (*e.g.*, has title to the property) and retains the burdens, benefits, and incidents of ownership (such as payment of taxes and maintenance charges with respect to the property); whether or not a person other than the lessee may be able to use the property after the lease term; the fact that the property may (or must) be bought or sold at the end of the lease term at a fixed or determinable price that is more or less than its fair market value at that time; and the fact that the lessee or a related party has provided financing or has guaranteed financing for the transaction (other than for the lessor's minimum 10 percent investment)."

addition, a transaction generally will not be given effect for tax purposes unless it serves some business purpose aside from reducing taxes. Because the leasing provision was intended to be only a transferability provision, many of the transactions that will be characterized as a lease under the safe harbor will have no business purpose (other than to transfer tax benefits). When the substance of the transaction is examined, the transaction may not bear any resemblance to a lease. [Staff of Joint Comm. on Taxation, 97th Cong., 1st Sess., General Explanation of the Economic Recovery Act of 1981, at 104 (Comm. Print 1981).]

The legislative history of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, 96 Stat. 324, which made substantial changes tightening the safe-harbor leasing provisions of the 1981 Act, confirms the statements and purposes of the 1981 Act, namely, that "ERTA [the 1981 Act] provided a new set of rules which represented a major departure from the prior law." Staff of Joint Comm. on Taxation, 97th Cong., 2d Sess., General Explanation of the Revenue Provisions of the Tax Equity and Fiscal Responsibility Act of 1982, at 45 (Comm. Print 1982). See S. Rept. 97-494, at 134-137 (Vol. 1) (1982), H. Rept. 97-760 (Conf.) (1982), 1982-2 C.B. 600, 611.

As we read the applicable statutory provisions and their legislative history, section 168(f)(8) was passed as a companion provision to the liberalized depreciation (i.e., ACRS) and investment credit provisions found in the 1981 Act, which were adopted to provide capital investment incentives. We think it clear that Congress' purpose in adopting the safe-harbor rules was to spur new capital formation by providing a mechanism by which potential investors in property (e.g., owners-users), unable to utilize these newly created tax incentives, could transfer them to another taxpayer. See S. Rept. 97-144 (1981), 1981-2 C.B. 412, 432; Staff of Joint Comm. on Taxation, 97th Cong., 1st Sess., General Explanation of the Economic Recovery Act of 1981, at 102-103 (Comm. Print 1981). Assuming without deciding that considerations of business purpose, economic substance, and profit objective independent of tax consequences are irrelevant to the application of section 168(f)(8) as such, there is not the slightest legislative indication that such elements should not be taken into account in determining whether the transactions of which the lease is but a part should be held to be "sham," with the result that the lease

itself may be held not to be entitled to the benefits of that section. The fact that section 168(f)(8) and its legislative history consistently reflect a singular focus—e.g., "the agreement of lease," "the agreement shall be treated as a lease," "the lease transaction"—clearly points in this direction. Petitioners ask us to adopt an approach which would guarantee a good apple against spoilage even if all the other apples in the barrel were rotten. This we cannot and will not do.

The key to our analysis is that we are not persuaded, on the basis of what appear to be the undisputed facts herein, that the lease can be isolated as a matter of law from the totality of the transactions involved—an essential prerequisite to granting petitioners' motion for summary judgment. It may be that, at trial, petitioners will be able to persuade us that the lease in fact should be so isolated and that their claim to the benefits of section 168(f)(8) is otherwise valid. They will, of course, also be able at trial to prove that, in their totality, the transactions involved herein were in fact founded on business purpose, economic substance, and profit objective with the consequence that they are entitled to the benefits of section 168(f)(8) in respect of the lease.

In view of the foregoing, we conclude that respondent is entitled to the opportunity at trial to contest petitioners' evidence that they are entitled to the safe-harbor benefits of section 168(f)(8) in the context of the issue as to whether the chain of transactions involved herein constituted a "sham." We think that, in this "sham" context, respondent should be entitled to explore the extent to which the various elements, which otherwise may be precluded by section 168(f)(8)(C) from consideration in a safe-harbor leasing arrangement, are present. This exploration will include the valuation of the recyclers in relation to the amounts and the terms and conditions of payment. In this connection, we reject petitioners' contention on brief, in support of their motion for summary judgment, that the issue of valuation is a new issue not raised in the notice of deficiency with the result that the burden of proof in respect thereto should be on respondent. The notice of deficiency disallowed petitioners' losses from RRA because "you have failed to establish that you are entitled to any

portion of the loss claimed under any provision of the Internal Revenue Code." We think this basis for disallowance is broad enough to include the valuation issue—an issue which is present in virtually all tax shelter cases. Cf. *Spangler v. Commissioner*, 32 T.C. 782, 793 (1959), affd. 278 F.2d 665 (4th Cir. 1960).

We next deal with respondent's contention that petitioners have, in any event, not proved, as a matter of law, that they have satisfied the "minimum investment" of the lessor requirement of section 168(f)(8)(B)(ii), namely, that such investment "(I) at the time the property is first placed in service under the lease, and (II) at all times during the term of the lease, is not less than 10 percent of the adjusted basis of such property." With respect to such "minimum investment," Temporary Income Tax Reg. section 5c.168(f)(8)-4(b), 46 Fed. Reg. 51908 (Oct. 23, 1981), provides, in pertinent part, that "The lessor must have sufficient net worth * * * to satisfy any personal liability incurred."[4] Therefore, based upon the facts set forth at the outset of this opinion, it appears that F & G was required to have maintained a positive net worth of at least $751,920, an ultimate figure with which petitioners appear not to

[4]Temporary Income Tax Reg. sec. 5c.168(f)(8)-4, 46 Fed. Reg. 51908 (Oct. 23, 1981), provides in its entirety as follows:

Sec. 5c.168(f)(8)-4. Minimum investment of lessor.

(a) *Minimum investment.* Under section 168(f)(8)(B)(ii), an agreement will not be characterized as a lease for purposes of section 168(f)(8) unless the qualified lessor has a minimum at risk investment which, at the time the property is placed in service under the lease and at all times during the term of the lease, is not less than 10 percent of the adjusted basis of the leased property. As the adjusted basis of the leased property is reduced by capital cost recovery deductions, the minimum investment required will also be reduced to 10 percent of the revised adjusted basis, until the adjusted basis has been completely recovered, at which time no minimum investment will be required. Financing provided by the lessee or a party related to the lessee, such as a recourse note given by the lessor to the lessee, will not be taken into account in determining the lessor's minimum investment.

(b) *At risk amount.* The minimum investment which the lessor has at risk with respect to the leased property for purposes of paragraph (a) of this section includes only consideration paid and recourse indebtedness incurred by the lessor to purchase the property. *The lessor must have sufficient net worth (without regard to the value of any leases which qualify under section 168(f)(8)) to satisfy any personal liability incurred.* Any tax benefits which the lessor derives from the leased property shall not be taken into account to reduce the amount the lessor has at risk. An agreement between the lessor and the lessee requiring either or both parties to purchase or sell the qualified leased property at some price (whether or not fixed in the agreement) at the end of the lease term shall not affect the amount the lessor has at risk with respect to the property. However, an option held by the lessor to sell the property that is exercisable before the end of the period prescribed under section 168(c)(2) for the recovery property class of the leased property (taking into account any election by the lessor or lessee under section 168(b)(3)) shall reduce the amount the lessor is considered to have at risk by the amount of the option price at the time the option becomes exercisable. [Emphasis added.]

disagree. Both parties engage in an analysis based upon figures reflected in the corporate income tax return (Form 1120) of F & G for its fiscal year ended August 1982. We see no need to explore the details of such an analysis. We think they clearly reveal a disputed factual issue which cannot be resolved solely on the basis of the tax return but will require fleshing out through other written evidence and possibly oral testimony at trial.

Finally, we note that, in the instant case, respondent supplemented the general allegation of "sham" by pointing to the serious questions which exist as to the nature of the transactions which preceded and followed the leasing transaction between F & G and RRA, including issues of valuation and speculative financing. Respondent's articulations were buttressed not only by affidavits but by the text of the RRA offering memorandum.[5] In this respect, the situation is quite different from that which existed in *King v. Commissioner*, 87 T.C. (1986), where we granted petitioners' motion for summary judgment because respondent failed to allege any facts to support his general allegations of "sham."

> *An order will be entered denying petitioner's motion.*

Reviewed by the Court.

STERRETT, SIMPSON, CHABOT, NIMS, PARKER, WHITAKER, KÖRNER, HAMBLEN, COHEN, CLAPP, SWIFT, JACOBS, GERBER, WRIGHT, and WELLS, *JJ.*, agree with this opinion.

SHIELDS, PARR, and WILLIAMS, *JJ.*, did not participate in the consideration of this case.

---

[5]This memorandum contributed substantially to the Court's ability to understand the nature of the elements involved in the series of transactions which underpin respondent's opposition to petitioners' motion for summary judgment.