FRANK B. SHORT AND KATHERINE F. SHORT, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.
RICHARD L. COLEMAN AND BETTY B. COLEMAN, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 75849, 75850. Filed March 14, 1961.

*W. Y. Wilkins, Esq.,* and *L. C. Dodge, CPA,* for the petitioners.
*Richard C. Forman, Esq.,* for the respondent.

TRAIN, *Judge:* Respondent determined deficiencies in the income tax of the petitioners for 1950 as follows:

| Petitioner | Deficiency |
|---|---|
| Frank B. Short and Katherine F. Short | $25,444.22 |
| Richard L. Coleman and Betty B. Coleman | 23,318.08 |

The sole issue to be decided is whether Edgewood Knoll Apartments, Inc., and Coleman Apartments, Inc., are collapsible corporations within the purview of section 117(m) of the Internal Revenue Code of 1939.

FINDINGS OF FACT.

Petitioners Richard L. Coleman (hereinafter referred to as Coleman) and Betty B. Coleman are husband and wife residing at Asheville, North Carolina. For the taxable year ended December 31, 1950, the petitioners' joint income tax return was filed with the then collector of internal revenue for the district of North Carolina.

Petitioners Frank B. Short (hereinafter referred to as Short) and Katherine F. Short are husband and wife residing at Asheville, North Carolina. For the taxable year ended December 31, 1950, the petitioners' joint income tax return was filed with the then collector of internal revenue for the district of North Carolina.

*Facts as to Edgewood Knoll Apartments, Inc.*

In the summer of 1949, options were taken on four tracts of land in the names of Coleman, Short, and Z. B. Robinson (hereinafter called Robinson) as optionees in the amount of $93,750. This land was to become the Edgewood Knoll Apartments, Inc., property (hereinafter called Edgewood Knoll). After the organization of Edgewood Knoll, title, which had been or was taken in the names of the optionees, was immediately transferred to Edgewood Knoll. In exchange for the land, Edgewood issued 941 shares of its class B common stock having a par value of $94,100 to Coleman, Short, and Robinson in equal amounts. The price at which Edgewood Knoll

obtained the land was the option price to the optionees plus certain transfer expenses. Neither Coleman, Short, nor Robinson sustained any profit on the transfer to Edgewood Knoll.

In the summer of 1949 Coleman, Short, and Robinson, as sponsors of Edgewood Knoll, applied to the Federal Housing Administration for a commitment for mortgage insurance under section 608 of the National Housing Act. The commitment was sought in connection with a rental project to be built by Edgewood Knoll in Asheville, North Carolina. On August 30, 1949, the Federal Housing Commissioner entered into such commitment in the amount of $1,283,000.

Edgewood Knoll was incorporated under the laws of the State of North Carolina on September 28, 1949. The incorporators were Coleman, Charles G. Buck, and James M. Poyner. The corporate charter was issued on October 5, 1949, and provided at clause 3:d that one of the objects for which the corporation was formed was as follows:

To apply for and obtain or cause to be obtained from the Federal Housing Commissioner a contract or contracts of mortgage insurance pursuant to the provisions of the National Housing Act amended, covering bonds, notes and other evidences of indebtedness issued by this corporation and any indenture of mortgage or deed of trust securing the same. So long as any property of this corporation is encumbered by a mortgage or deed of trust insured by the Federal Housing Commissioner it shall engage in no business other than the construction and operation of a rental housing project or projects.

The authorized capital of Edgewood Knoll was $350,000 consisting of 100,000 shares of class A common stock having a par value of $1 per share, 2,499 shares of class B common stock having a par value of $100 per share, and 100 shares of preferred stock having a par value of $1 per share.

On October 10, 1949, the first meeting of the incorporators and subscribers to the capital stock of Edgewood Knoll was held. On the same day, the first meeting of the board of directors of Edgewood Knoll was held. Coleman, Robinson, and Short were elected the directors of the corporation.

On or about October 10, 1949, Edgewood Knoll issued stock as follows:

| Type of stock | Number of shares | Name of shareholder | Consideration stated on corporate documents |
|---|---|---|---|
| A | 100 | R. L. Coleman | Cash. |
| A | 100 | F. B. Short | Cash. |
| A | 100 | Z. B. Robinson | Cash. |
| Preferred | 100 | Federal Housing Administration | Cash. |
| B | 494.51 | Wm. G. Lyles, Bissett, Carlisle & Wolff | Services. |
| B | 313.67 | F. B. Short | Land |
| B | 313.67 | R. L. Coleman | Land. |
| B | 313.67 | Z. B. Robinson | Land. |
| B | 64.16 | R. L. Coleman | Cash. |
| B | 64.16 | F. B. Short | Cash. |
| B | 64.16 | Z. B. Robinson | Cash. |

Architect for the Edgewood Knoll project was the firm of William G. Lyles, Bissett, Carlisle & Wolff, having its principal office at Columbia, South Carolina. The contract between Edgewood Knoll and William G. Lyles, Bissett, Carlisle & Wolff (hereinafter called the architects) dated October 10, 1949, provided that the architects' fee was to be $64,451, of which $15,000 was to be paid in cash and the balance in class B common stock having a par value of $49,451.

On the date that Edgewood Knoll issued 494.51 shares of class B common stock to the architects, it had a fair market value of $10,660.

The prime contractor of the Edgewood Knoll project was Robinson Brothers Contractors, Inc., a corporation controlled by Robinson. The construction contract provided that Edgewood would pay $1,198,269 cash, or cost plus $25,000, whichever was lower.

On October 10, 1949, Edgewood Knoll obtained a loan from the Security National Bank of Greensboro, North Carolina, in the amount of $1,283,000 which was evidenced by a promissory note of the same date. To secure the loan, Edgewood Knoll gave a deed of trust dated October 10, 1949, to the bank covering the Edgewood Knoll property. Actual construction of the Edgewood Knoll rental housing project, comprising 166 units, was begun on or about October 10, 1949, and construction was completed on or about December 15, 1950.

The Security National Bank of Greensboro advanced money on account of construction on the following dates and in the following amounts, which advances were construction advances on the portion of the work acceptably completed as approved by the Security National Bank of Greensboro and the Federal Housing Administration:

| | |
|---|---|
| Oct. 17, 1949 — $6,415 / 6,415 / 12,830 / 20,501 | $46,162.00 |
| Nov. 30, 1949 | 37,463.00 |
| Dec. 7, 1949 | 172,576.00 |
| Jan. 9, 1950 | 167,069.59 |
| Feb. 9, 1950 | 157,807.34 |
| Mar. 11, 1950 | 194,812.22 |
| Apr. 7, 1950 | 77,895.34 |
| May 15, 1950 | 155,197.22 |
| June 20, 1950 | 44,294.46 |
| July 19, 1950 | 69,322.32 |
| Dec. 14, 1950 | 160,401.51 |
| Total | 1,283,000.00 |

Prior to final completion, various units became available for occupancy and were rented out by the corporation. Rents were collected by Edgewood Knoll during its fiscal year ended November 30, 1950, as follows:

*1950*

| | |
|---|---|
| March | $216. 99 |
| April | 2, 318. 81 |
| May | 3, 483. 31 |
| June | 5, 243. 72 |
| July | 7, 302. 51 |
| August | 9, 687. 75 |
| September | 10, 928. 43 |
| October | 11, 654. 59 |
| November | 12, 048. 09 |
| Total | 62, 947. 20 |

In the FHA project analysis dated June 24, 1949, it was anticipated that Edgewood Knoll would have yearly net income after operating expenses and taxes of $85,166.

On December 3, 1949, the architects sent the following letter to Coleman, Short, and Robinson:

Messrs. Richard L. Coleman, Z. B. Robinson
and F. B. Short
Edgewood Knoll Apartments, Inc.
*40 Martindale*
*Asheville, North Carolina*

Gentlemen:

You will recall that our contract with Edgewood Knoll Apartments, Inc. for architectural services in connection with the construction of this project provided for a cash payment in the amount of $15,000.00 to be made to us by the corporation and the balance of our fee payable with 494.51 shares of Class B Common Stock of the corporation.

This letter is to state that we will sell to any one or all of you the above mentioned shares of stock for the cash sum of $10,660.00, provided we receive payment therefor, together with $13,500.00 of the cash fee which is still unpaid (a total amount of $24,160.00) prior to January 1, 1950.

Yours very truly,

WILLIAM G. LYLES
BISSETT, CARLISLE & WOLFF
(Signed) W. G. Lyles

On December 29, 1949, Coleman, Short, and Robinson each issued a personal check in the amount of $3,553.33 to the architects and each man in turn received one-third of the 494.51 shares of class B common stock held by the architects.

As of November 30, 1950, the books of Edgewood Knoll showed that the corporation had paid $165,450.85 for land and $1,010,360.14 for buildings and equipment, or a total construction cost of $1,175,810.99. Included in the figure $1,010,360.14 is $49,451 representing the 494.51 shares of class B common stock issued to the architects. On November 30, 1950, by journal entry to the books of Edgewood Knoll, an appreciation surplus account was set up and credited with $178,909.01, to reflect an FHA appraisal of the Edgewood Knoll property. Of this $178,909.01 appreciation, $45,311.15 was debited to the land account

for a total of $210,762 while the balance of $133,597.86 was debited to the buildings and equipment account for a total of $1,143,958.

On December 29, 1950, Edgewood Knoll redeemed all 1,627.97 shares of its outstanding class B common stock from Coleman, Short, and Robinson for $204,000 payable $68,000 to each stockholder.

The difference between $162,797 par value of class B common stock issued and outstanding, and $204,000, the redemption price, namely, $41,203, was charged on the books of Edgewood Knoll to the appreciation surplus account created by the journal entry of November 30, 1950, referred to hereinbefore.

The following schedule summarizes the transactions (relating only to the petitioners Coleman and Short) in Edgewood Knoll stock set forth above:

|  | Shares | Par value | Redemption price | Actual cost | Profit or gain |
|---|---|---|---|---|---|
| Issued for land | 627.34 | $62,734 | $78,607.55 | $62,734.00 | $15,873.55 |
| Issued for cash | 128.32 | 12,832 | 16,079.04 | 12,832.00 | 3,247.04 |
| Purchased from architects | 329.71 | 32,971 | 41,313.41 | 7,106.66 | 34,206.75 |
| Total | 1,085.37 | 108,537 | 136,000.00 | 82,672.66 | 53,327.34 |

On its Federal income tax returns Edgewood Knoll reported a profit (or loss) for the period indicated as follows:

| | |
|---|---|
| Beginning to Nov. 30, 1950 | ($14,590.80) |
| Dec. 1, 1950 to Nov. 30, 1951 | (5,999.91) |
| Dec. 1, 1951 to Nov. 30, 1952 | (40,593.32) |
| Dec. 1, 1952 to Nov. 30, 1953 | (8,441.53) |
| Dec. 1, 1953 to Nov. 30, 1954 | (8,434.05) |
| Dec. 1, 1954 to Dec. 31, 1954 | (3,561.79) |
| Jan. 1, 1955 to Dec. 31, 1955 | 7,551.36 |
| Jan. 1, 1956 to Dec. 31, 1956 | (14,725.03) |
| Jan. 1, 1957 to Dec. 31, 1957 | (14,598.99) |
| Jan. 1, 1958 to Dec. 31, 1958 | 1,854.87 |

The consideration paid the architects in class B common stock was deducted by Edgewood Knoll from the cost basis of its depreciable assets for the purpose of computing depreciation on its Federal income tax returns for its fiscal years ended November 30, 1950, and November 30, 1951. This amount was restored by it in subsequent years.

When Edgewood Knoll redeemed its class B common stock from petitioners, it had not realized a substantial part of the net income to be derived from the property.

Edgewood Knoll was formed or availed of principally for the manufacture, construction, or production of property, with a view to (1) a distribution to petitioners, prior to the realization by Edgewood Knoll of a substantial part of the net income to be derived from the property; and (2) the realization by petitioners of the gain attributable to the property.

## *Facts as to Coleman Apartments, Inc.*

On or about August 19, 1949, Coleman and Short purchased from Spray Cotton Mills a tract of land on which the Coleman Apartments, Inc. (hereinafter called Coleman Apartments), were later constructed. They paid $16,000 for the land, for which Short gave his personal check. In the FHA project analysis dated June 24, 1949, the land was appraised as having a fair market value of $40,000. On September 6, 1949, Coleman and Short conveyed this tract of land to Coleman Apartments in exchange for 400 shares of class B common stock having a par value of $100 per share. This exchange as to the value of the land was approved by the board of directors of the corporation. On that date the 400 shares of class B common stock had a fair market value of $16,000.

In the summer of 1949, Coleman and Short as sponsors of Coleman Apartments applied to the Federal Housing Administration for a commitment for mortgage insurance under section 608 of the National Housing Act. The commitment was sought in connection with a rental project to be built by Coleman Apartments in Asheville, North Carolina. On June 27, 1949, the Federal Housing Commissioner entered into such a commitment in the amount of $772,000.

Coleman Apartments was incorporated under the laws of the State of North Carolina on August 20, 1949. The incorporators were Coleman, Short, Robertson Wall, and James M. Poyner. The corporate charter was issued on August 30, 1949, and provided at clause 3 :d that one of the objects for which the corporation was formed was as follows:

To apply for and obtain or cause to be obtained from the Federal Housing Commissioner a contract or contracts of mortgage insurance pursuant to the provisions of the National Housing Act as amended, covering bonds, notes and other evidences of indebtedness issued by this corporation and any indenture of mortgage or deed of trust securing the same. So long as any property of this corporation is encumbered by a mortgage or deed of trust insured by the Federal Housing Commissioner it shall engage in no business other than the construction and operation of a rental housing project or projects.

The authorized capital of Coleman Apartments was $300,000 consisting of 100,000 shares of class A common stock having a par value of $1 per share, 1,999 shares of class B common stock having a par value of $100 per share, and 100 shares of preferred stock having a par value of $1 per share.

On September 6, 1949, the first meeting of the incorporators and subscribers to the capital stock of Coleman Apartments was held. On the same date, the first meeting of the board of directors of Coleman Apartments was held. Coleman, Short, and Betty B. Coleman were elected as the directors of Coleman Apartments.

On or about September 6, 1949, Coleman Apartments issued stock as follows:

| Type of stock | Number of shares | Name of shareholder | Consideration stated on corporate documents |
|---|---|---|---|
| A | 200 | Richard L. Coleman | Cash. |
| A | 200 | F. B. & Katherine F. Short | Cash. |
| B | 200 | Richard L. Coleman | Land. |
| B | 57.9 | Richard L. Coleman | Cash. |
| B | 200 | F. B. Short | Land. |
| B | 57.9 | F. B. Short | Cash. |
| B | 623.34 | Wm. G. Lyles, Bissett, Carlisle & Wolff | Services. |
| Preferred | 100 | Federal Housing Administration | Cash. |

The architect on the Coleman Apartments project was the firm of William G. Lyles, Bissett, Carlisle & Wolff. The contract between Coleman Apartments and the architects, dated September 6, 1949, provided that the architects' fee was to be $72,334, of which $10,000 was to be paid in cash and the balance in class B common stock having a par value of $62,334.

On the date that the 623.34 shares of class B common stock were issued to the architects, it had a fair market value of $5,440.

The contractor of the Coleman Apartments project was Coleman Construction Company, a corporation controlled by Coleman. The construction contract provided for a contract sum of $723,170 cash, or cost plus $15,000, whichever was lower.

On September 6, 1949, Coleman Apartments obtained from the Wachovia Bank and Trust Company of Asheville, North Carolina, the amount of $772,000, which was evidenced by a promissory note of even date. To secure the loan, Coleman Apartments gave a deed of trust dated September 6, 1949, to the bank covering the Coleman Apartments property.

Actual construction of the Apartments' housing project, comprising 112 units, was begun on or about September 6, 1949. Construction was completed on or about December 1, 1950.

The Wachovia Bank and Trust Company of Asheville, North Carolina, advanced money on account of construction on the following amounts which advances were construction advances on the portion of the work acceptably completed as approved by the Wachovia Bank and Trust Company of Asheville and the Federal Housing Administration:

| | | |
|---|---|---|
| Sept. 16, 1949 | $21,670.00 | |
| | 7,720.00 | |
| | | $29,390.00 |
| Oct. 17, 1949 | | 30,736.25 |
| Nov. 3, 1949 | | 82,790.00 |
| Nov. 30, 1949 | | 129,625.70 |
| Jan. 9, 1950 | | 153,162.54 |

| | |
|---|---:|
| Feb. 8, 1950 | 94, 680. 20 |
| Mar. 17, 1950 | 66, 499. 85 |
| Apr. 28, 1950 | 46, 296. 45 |
| May 17, 1950 | 46, 656. 85 |
| July 19, 1950 | 10, 480. 13 |
| Nov. 30, 1950 | ⎰ 79, 682. 03 ⎱ 2, 000. 00 |
| | 81, 682. 03 |
| | 772, 000. 00 |

Prior to final completion, various units became available for occupancy and were rented out by the corporation. Rents were collected by Coleman Apartments, Inc., during its fiscal year ended November 30, 1950, as follows:

*1950*

| | |
|---|---:|
| March | $585. 67 |
| April | 2, 480. 01 |
| May | 3, 043. 31 |
| June | 4, 599. 22 |
| July | 5, 665. 33 |
| August | 6, 521. 34 |
| September | 7, 049. 00 |
| October | 7, 283. 66 |
| November | 7, 470. 00 |
| Total | 44, 801. 50 |

In the FHA project analysis dated June 24, 1949, it was anticipated that Coleman Apartments would have net income after operating expenses and taxes of $50,984.

On December 3, 1949, the architects sent the following letter to Coleman and Short:

Messrs. Richard L. Coleman
and F. B. Short
Coleman Apartments, Inc.
*40 Martindale*
*Asheville, North Carolina*

Gentlemen:

You will recall that our contract with Coleman Apartments, Inc. for architectural services in connection with the construction of this project provided for a cash payment in the amount of $10,000.00 to be made to us by the corporation and the balance of our fee payable with 623.34 shares of Class B Common Stock of the corporation.

This letter is to state that we will sell to either or both of you the above mentioned shares of stock for the cash sum of $5,440.00, provided we receive payment therefor, together with $7,500.00 of the cash fee which is still unpaid (a total amount of $12,940.00) prior to January 1, 1950.

Yours very truly,

WILLIAM G. LYLES
BISSETT, CARLISLE & WOLFF
(Signed) W. G. Lyles

On December 7, 1949, Coleman and Short each issued a personal check in the amount of $2,720 to the architects. In return, each man in turn received one-half of the 623.34 shares of class B common stock held by the architects.

As of November 30, 1950, the books of Coleman Apartments showed that the corporation had paid $68,553.26 for land and $658,471.36 for buildings and equipment, for a total cost of construction of $727,024.62. Included in the figure $658,471.36 is $62,334 representing the 623.34 shares of class B common stock issued to the architects. On November 30, 1950, by journal entry to the books of Coleman Apartments, an appreciation surplus account was set up and credited with $91,001.38 to reflect an FHA appraisal of the Coleman Apartments property. Of this $91,001.38 appreciation, $49,070.74 was debited to the land account for a total of $117,624, while the balance of $41,930.64 was debited to the buildings and equipment account for a total of $700,402.

On December 30, 1950, Coleman Apartments redeemed all 1,139.14 shares of its outstanding class B common stock from Coleman and Short for $128,000, payable $64,000 to each stockholder.

The difference between $113,914, par value of class B common stock issued and outstanding, and $128,000, the redemption price, namely, $14,086, was charged on the books of Coleman Apartments against appreciation surplus account created by the journal entry of November 30, 1950, referred to hereinbefore.

The following schedule summarizes the transactions in Coleman Apartments stock set forth above:

| | Shares | Par value | Redemption price | Actual cost | Profit or gain |
|---|---|---|---|---|---|
| Issued for land | 400 | $40,000 | $44,946.20 | $16,000 | $28,946.20 |
| Issued for cash | 115.8 | 11,580 | 13,011.92 | 11,580 | 1,431.92 |
| Purchased from architects | 623.34 | 62,334 | 70,041.88 | 5,440 | 64,601.88 |
| Total | 1,139.14 | 113,914 | 128,000.00 | 33,020 | 94,980.00 |

On its Federal income tax returns Coleman Apartments reported a profit (or loss) for the periods indicated as follows:

| | |
|---|---|
| Beginning to Nov. 30, 1950 | ($426.36) |
| Dec. 1, 1950 to Jan. 31, 1951 | (1,563.85) |
| Feb. 1, 1951 to Nov. 30, 1951 | (5,516.95) |
| Dec. 1, 1951 to Nov. 30, 1952 | (17,062.24) |
| Dec. 1, 1952 to Nov. 30, 1953 | (13,137.44) |
| Dec. 1, 1953 to Nov. 30, 1954 | (15,073.40) |
| Dec. 1, 1954 to Dec. 31, 1954 | (3,160.77) |
| Jan. 1, 1955 to Dec. 31, 1955 | (28,165.24) |
| Jan. 1, 1956 to Dec. 31, 1956 | (17,588.62) |

Salaries as follows were paid to Coleman or Short or members of their families by Coleman Apartments for the periods indicated:

Beginning to Nov. 30, 1950_____ $2,250
Dec. 1, 1950 to Jan. 31, 1951_____ 400
Feb. 1, 1951 to Nov. 30, 1951_____ 2,000
Dec. 1, 1951 to Nov. 30, 1952_____ 400

A rental management fee of 5 percent of rents received was paid by Coleman Apartments to the R. L. Coleman Company (a corporation controlled by petitioners) for services rendered and expenses incurred on behalf of Coleman Apartments for the periods indicated as follows:

Beginning to Nov. 30, 1950_____ $2,239.30
Dec. 1, 1950 to Jan. 31, 1951_____ 771.95
Feb. 1, 1951 to Nov. 30, 1951_____ 3,741.83
Dec. 1, 1951 to Nov. 30, 1952_____ 4,006.29
Dec. 1, 1952 to Nov. 30, 1953_____ 4,578.25
Dec. 1, 1953 to Nov. 30, 1954_____ 4,352.50
Dec. 1, 1954 to Dec. 31, 1954_____ 367.82
Jan. 1, 1955 to Dec. 31, 1955_____ 3,643.70
Jan. 1, 1956 to Dec. 31, 1956_____ 955.54

Coleman Apartments defaulted on its mortgage payments and the property was foreclosed in 1956.

The consideration paid the architects in class B common stock was deducted by Coleman Apartments from its cost basis for the purpose of computing depreciation on its Federal income tax returns for its fiscal years ended November 30, 1950, and November 30, 1951. This amount was restored by it in subsequent years.

When Coleman Apartments redeemed its class B common stock from petitioners, it had not realized a substantial part of the net income to be derived from the property.

Coleman Apartments was formed or availed of principally for the manufacture, construction, or production of property, with a view to (1) a distribution to petitioners, prior to the realization by Coleman Apartments of a substantial part of the net income to be derived from the property; and (2) the realization by petitioner of the gain attributable to the property.

### OPINION.

Petitioners have conceded that a third corporation, West Terrace Apartments, Inc., was a collapsible corporation within the purview of section 117(m) of the Internal Revenue Code of 1939. Respondent concedes that the amount of gain in that instance should have been $8,200 rather than $8,350 as shown in the notice of deficiency. These concessions will be given effect in the Rule 50 computation.[1]

---

[1] Petitioner Coleman also contends on brief that the gain derived from the sale of shares in the Palm Beach Kennel Club was incorrectly determined. No such issue is presented in the pleadings. Under our rules the petition must clearly set forth each assignment of error and must allege facts to support each assignment. Having failed to comply with the rules, this issue is now foreclosed.

The sole issue for decision is whether Edgewood Knoll and Coleman Apartments are collapsible corporations within the meaning of section 117(m) of the 1939 Code.[2] If they are, the gain realized by petitioners on the redemption of the class B common stock of each corporation will be taxed as gain from the sale or exchange of property which is not a capital asset.[3]

Petitioners do not deny that Edgewood Knoll and Coleman Apartments are collapsible corporations within the meaning of section 117(m)(2)(A); they contend, however, that the provisions of that section are nonetheless inapplicable because of the limitation imposed by section 117(m)(3)(B),[4] claiming, in effect, that more than 30 percent of the gain was attributable other than to the "property."

As set forth in our findings, the architects received for their services, in addition to cash, stock with a stated par value of $111,785. Of this amount, the architects shortly thereafter sold stock with a par value of $95,305 to petitioners (the balance being sold to Robinson, not a petitioner here) for $12,546.67 (Robinson paying an additional $3,553.33 to bring the total purchase price to $16,100). The corporations then redeemed from the petitioners for $111,355.29 the stock for which they had paid $12,546.67. Thus, there was an undisputed gain to petitioners on the redemption of $98,808.62. The excess of the redemption price over par value, namely, $16,050.29, is a premium and attributable to "the property." However, the balance of the gain the petitioners argue is attributable not to the property, as determined by respondent, but rather to the fact that they were able to make an advantageous purchase of the architects' stock.

---

[2] SEC. 117. CAPITAL GAINS AND LOSSES.
  (m) COLLAPSIBLE CORPORATIONS.—
   \*      \*      \*      \*      \*      \*      \*
  (2) DEFINITIONS.—
      (A) For the purposes of this subsection, the term "collapsible corporation" means a corporation formed or availed of principally for the manufacture, construction, or production of property, or for the holding of stock in a corporation so formed or availed of, with a view to—
        (i) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, prior to the realization by the corporation manufacturing, constructing, or producing the property of a substantial part of the net income to be derived from such property, and
        (ii) the realization by such shareholders of gain attributable to such property.
[3] SEC. 117. CAPITAL GAINS AND LOSSES.
  (m) COLLAPSIBLE CORPORATIONS.—
    (1) TREATMENT OF GAIN TO SHAREHOLDERS.—Gain from the sale or exchange (whether in liquidation or otherwise) of stock of a collapsible corporation, to the extent that it would be considered (but for the provisions of this subsection) as gain from the sale or exchange of a capital asset held for more than 6 months, shall, except as provided in paragraph (3), be considered as gain from the sale or exchange of property which is not a capital asset.
[4] SEC. 117. CAPITAL GAINS AND LOSSES.
  (m)(3). LIMITATIONS ON APPLICATION OF SUBSECTION.—In the case of gain realized by a shareholder upon his stock in a collapsible corporation—
   \*      \*      \*      \*      \*      \*      \*
      (B) this subsection shall not apply to the gain recognized during a taxable year unless more than 70 per centum of such gain is attributable to the property so manufactured, constructed, produced, or purchased; and

For such a contention to hold water, it is necessary to assume that the architects' services actually had a value of the cash received plus the par value of the stock received. The petitioners contend that Edgewood Knoll and Coleman Apartments entered into arm's-length contracts with the architects to perform services at stipulated fees and that the issuance of all the stock was subject to the approval of the respective boards of directors as to the adequacy of the consideration received. The petitioners maintain that they have presented a prima facie case of the value of the stock, citing the respondent's own regulations [5] as well as a statute of the State of North Carolina.[6]

Ingenious as is this "boot-strap" operation, whereby the petitioners seek to establish the value of the stock, we are satisfied that the evidence establishes otherwise. The very fact that the architects offered to sell (and did sell) par value stock of $49,451 for $10,660 and par value stock of $62,334 for $5,440 indicates that stated par value bore little, if any, relation to the actual values assigned by them. There is no evidence to explain why the total Edgewood Knoll fee was approximately $8,000 lower than the Coleman Apartments' fee when Edgewood Knoll had a projected cost of almost $500,000 more than the other. That the stated par value of the stock had little relation to the value of the architects' services is further suggested by the fact that that very par value was excluded from cost basis by the two corporations in computing depreciation for the 1950 and 1951 fiscal years. That this procedure was changed in 1952 does not require us to shut our eyes to the significance of a determination made at the time. The facts of this case fit a pattern followed in some of the recent "collapsible" cases. Compare *C. D. Spangler*, 32 T.C. 782 (1959), affd. 278 F. 2d 665 (1960), certiorari denied 364 U.S. 825 (1960); *R. A. Byran*, 32 T.C. 104 (1959), reversed on other grounds 281 F. 2d 238 (1960), certiorari denied 364 U.S. 931 (1961); *W. H. Weaver*, 32 T.C. 411 (1959), reversed on other grounds 281 F. 2d 238 (1960).

Petitioners' reliance upon the North Carolina statute cited above is misplaced. In *Goodman* v. *White*, 174 N.C. 399, 93 S.E. 906, the North Carolina court held that the burden of proof upon a plea of payment is on the one pleading it, the petitioners in this case. The

---

[5] REGS. 111, sec. 29.22(a)-3. COMPENSATION PAID OTHER THAN IN CASH.—If services are paid for with something other than money, the fair market value of the thing taken in payment is the amount to be included as income. If the services were rendered at a stipulated price, in the absence of evidence to the contrary such price will be presumed to be the fair value of the compensation received. * * *

[6] N.C. Gen. Stat., sec. 55–62. Stock to be paid in money or money's worth; issue for labor or property.—Nothing but money shall be considered as payment for any part of the capital stock of any corporation organized under this chapter, except as herein provided in case of the purchase of property or labor performed. Any corporation may issue stock for labor done or personal property or real estate, or leases thereof, and, in the absence of fraud in the transaction, the judgment of the directors as to the value of such labor, property, real estate or leases shall be conclusive. (1901, c. 2, §§ 19, 53; 1903, c. 660, §§ 2, 3; Rev., §§ 1159, 1160; C.S., § 1157.)

court went further to hold that "he must therefore establish that the property was taken in payment at its true value, and further that such value was approved by a board of directors acting independently in the interest of the corporation, whose judgment is conclusive except in the case of fraud." The petitioners have failed to satisfy either requirement. In *Whitlock* v. *Alexander*, 160 N.C. 465, 76 S.E. 538, 540, the Supreme Court of North Carolina held, on a similar question, that "a 'gross and obvious overvaluation of property' is strong evidence of fraud."

Factually, we find no significant difference between the case before us and *C. D. Spangler, supra*. In that case, just as in this case, two apartment house corporations were involved. The same firm of architects, William G. Lyles, Bissett, Carlisle & Wolff, received as part of their fee class B common stock in the corporations, and similarly for some unexplained reason, within a few months after the issuance of the stock it was sold to the owners of the class A common stock for substantially less than its par value. The only difference between the contentions in *Spangler* and those in this case, is that in *Spangler*, the petitioner contended that the gain was due to certain other factors, such as offsite improvements, whereas in this case the petitioners contend the gain was due to their good fortune in being able to purchase the architects' stock at a low price. The United States Court of Appeals for the Fourth Circuit referred to the contentions in *Spangler* as "specious." We believe the contentions raised in the instant case are equally without merit.

We are convinced, particularly in view of all the attendant circumstances, that the best evidence of the fair market value of the architects' stock was the price at which it was sold a short time after its issuance. Fair market value is the price at which property would change hands between a willing buyer and willing seller, neither being under any compulsion to buy or sell and both being reasonably informed as to all relevant facts. Here there is no evidence that the architects were under any compulsion to sell their stock or that they were not reasonably informed as to all relevant facts. We have found as a fact that on September 6, 1949, the class B common stock of Coleman Apartments issued to the architects had a fair market value of $5,440, and that, on October 10, 1949, the class B common stock of Edgewood Knoll issued to the architects had a fair market value of $10,660.

Since the petitioners have failed in their contention that the gain realized by them upon the redemption of the stock acquired by them from the architects was attributable to an advantageous purchase, we conclude that the gain in question was attributable to the property.

On or about August 19, 1949, Coleman and Short purchased from Spray Cotton Mills a tract of land on which Coleman Apartments were later constructed. The purchase price was $16,000, for which

Short gave his personal check. On September 6, 1949, Coleman and Short conveyed this tract of land to Coleman Apartments in exchange for 400 shares of class B common stock having a par value of $40,000. In their second effort to bring the gain here involved within the limitations of section 117(m)(3)(B), *supra*, petitioners contend that they sustained a taxable gain of $24,000 in 1949 when they exchanged this land for the 400 shares of class B common stock having a par value of $40,000. If this were the case, they would have achieved a "stepped-up" basis at that time with a consequent reduction in the gain to be recognized in 1950.

To support their contention, petitioners point out that on June 24, 1949, the FHA appraised the land at $40,000 and argue that the non-recognition provision of section 112(b)(5), I.R.C. 1939,[7] is not applicable because they were not in control of 80 percent of all the outstanding stock immediately after the transfer as required by the regulations.[8] Relying on *Arthur Sorin*, 29 T.C. 959, 972 (1958), affd. 271 F. 2d 741 (1959),[9] petitioners contend that under North Carolina General Statutes, sec. 55-62, the burden of proof was shifted to respondent once they had shown the directors had approved the value of the land received for the class B common stock of Coleman Apartments.

As with respect to the architects' stock, here again we cannot agree with petitioners' position. It is true that on June 24, 1949, the FHA had appraised the land at $40,000. However, at that time Coleman and Short had not purchased the land from Spray Cotton Mills. The price that they actually paid on August 19, 1949, namely $16,000, is better evidence of its fair market value than the appraisal. Accordingly, we have found as a fact that on September 6, 1949, the day the land was exchanged for stock in Coleman Apartments,

[7] SEC. 112. RECOGNITION OF GAIN OR LOSS.
  (b) EXCHANGES SOLELY IN KIND.—
  *       *       *       *       *       *       *
    (5) TRANSFER TO CORPORATION CONTROLLED BY TRANSFEROR.—No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation; but in the case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange. * * *

[8] REGS. 111, sec. 29.112(b)(5)–1. TRANSFER OF PROPERTY TO CORPORATIONS CONTROLLED BY TRANSFEROR.—* * * to be in "control" of the transferee corporation such person or persons must own immediately after the transfer stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and at least 80 percent of the total number of shares of all other classes of stock of such corporation. (See section 112(h).)

[9] In *Arthur Sorin* we stated (p. 972):
"Without assuming that the stipulation alone would be sufficient to sustain petitioners' burden, there are other facts in the record, including the par value of the stock. The presumption under local law would require that the stock be issued to petitioner Henrietta for money, labor done, or property actually received. Sec. 69, N.Y. Stock Corp. Law. At least, if there were any suggestion that petitioners or the corporation had proceeded unlawfully, the burden of going forward would be upon respondent. *Washington Post Co.,* 10 B.T.A. 1077; *W. H. Weaver, supra* at 1081. * * *"

it had a fair market value of $16,000. Thus, no gain was involved in the transaction. For the reasons stated with respect to their first contention, their reliance on the North Carolina statute is likewise of no avail in this instance. *Whitlock* v. *Alexander, supra; Goodman* v. *White, supra; Gover* v. *Malever*, 187 N.C. 774, 122 S.E. 841. In *Goodman* v. *White, supra,* the court pointed to the fact that, if there had been a board of directors which had approved the purchase price, that board had been made up of the purchaser, his son, and one other. Under such a circumstance, the court expressed strong skepticism about the alleged independent judgment of the board. In the instant case, the board consisted of Coleman, his wife, and Short. We do not believe the petitioners have met the tests established by the courts of North Carolina with respect to the statute in question. This being the case, *Arthur Sorin* does not aid them.

In view of our finding that the land had a fair market value on September 6, 1949, the day it was exchanged for the stock of Coleman Apartments, we need not consider the applicability of section 112(b) (5). Accordingly, we hold that when Coleman Apartments redeemed its class B common stock the gain on the stock issued for the land was attributable to the property constructed.

We have set forth in our findings the net losses reported by Coleman Apartments for the period November 30, 1950, to December 31, 1956. In 1956 Coleman Apartments defaulted on its mortgage payments and the property was foreclosed. Petitioners contend, finally, that since the record shows that Coleman Apartments, from its inception to the foreclosure of its physical properties in 1956, realized no profit, this corporation does not fit the definition in section 117(m)(2)(A)(i) of a corporation formed or availed of with a view to "a distribution of its shareholders, prior to the realization by the corporation * * * of a substantial part of the net income to be derived from such property." Petitioners point out that the peculiar facts (foreclosure of the physical properties before any net income was derived by the corporation from them) make realization of net income impossible.

In further support of this contention, petitioners rely on *Abbott* v. *Commissioner*, 258 F. 2d 537, 542 (C.A. 3, 1958), affirming 28 T.C. 795 (1957), wherein the court stated:

> The real question posed by the statute, however, is not whether a substantial part of the total profit was realized prior to dissolution, but rather whether that part of the total profit realized *after* dissolution was substantial. This was the test correctly applied by the Tax Court in making its finding that the dissolution took place before a substantial part (nearly 90%) of the total profit was realized.

We are unable to agree with petitioners' position. The FHA project analysis projects the yearly net income after operating expenses and taxes as follows:

Edgewood Knoll_____ $85,166
Coleman Apartments_____ 50,984

The words "the net income to be derived from such property" means the total income which on the redemption dates might reasonably have been expected from the properties. *Rose Sidney*, 30 T.C. 1155, 1163 (1958), affd. 273 F. 2d 928 (C.A. 2, 1960); *G. A. Heft*, 34 T.C. 86 (1960). We are not unmindful of the language used by the United States Court of Appeals for the Third Circuit quoted above. However, we find nothing in our opinion (28 T.C. 795) which indicates this is the test we applied. The statute does not require that net income from the property should in fact subsequently develop if the corporation has been availed of with a view to making the distribution prior to the corporation's realization of a substantial part of net income. *Payne* v. *Commissioner*, 268 F. 2d 617 (C.A. 5, 1959); *C. D. Spangler*, *supra*.

Since petitioners have failed to bring themselves within the exception of section 117(m)(3)(B), we hold that both Edgewood Knoll and Coleman Apartments are collapsible corporations within the meaning of section 117(m)(2)(A) of the 1939 Code.

*Decisions will be entered under Rule 50.*